**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALYCIA JOHNS, | CIVIL ACTION |
| **Plaintiff,** | |
| v. | |
| NELNET, | NO.  22-4791 |
| FIRST PREMIER BANK, | |
| LVNV FUNDING, | |
| EQUIFAX INFORMATION SERVICES, LLC, | |
| EXPERIAN INFORMATION SOLUTIONS, INC., | |
| TRANSUNION, LLC and | |
| RESURGENT CAPITAL SERVICES LP, | |
| **Defendants.** | |

**MEMORANDUM**

HODGE, J.                                                March 31, 2026

Plaintiff Alycia Johns ("Johns") brings this action under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA") and Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA") following several years of disputing various tradelines with credit reporting agencies based on her claim of identity theft. Before the Court are Motions for Summary Judgment by Defendant Nelnet Servicing, LLC ("Nelnet") (ECF No. 129), Equifax Information Services, LLC ("Equifax") (ECF No. 131), LVNV Funding ("LVNV") and Resurgent Capital Services LP ("Resurgent") (ECF No. 134), First Premier Bank ("First Premier") (ECF No. 136), and TransUnion, LLC ("TransUnion") (ECF No. 140) (collectively, "Summary Judgment Defendants"), and the oppositions to these motions, replies in support of these motions, and supplemental briefing. Also before the Court are Motions for Partial Summary Judgment by Johns against Equifax (ECF No. 135), TransUnion (ECF No. 137), and Nelnet (ECF No. 139), and the

oppositions to these motions, replies in support of these motions, sur-replies to these motions, and supplemental briefing.

Also before the Court are Motions to Exclude Plaintiff's Expert, Douglas Hollon, filed by Defendants Nelnet (ECF No. 130), Equifax and TransUnion (ECF No. 133), LVNV and Resurgent (ECF No. 138), and First Premier (ECF No. 142), the oppositions to these motions, and replies in support of these motions.

For the reasons that follow, the Motions to Exclude Plaintiff's Expert are granted. Plaintiff's Summary Judgment Motions are denied. Defendants' Summary Judgment Motions are granted in part and denied in part.

## I.    BACKGROUND

### A.    Factual Background[1]

Johns was adopted when she was eight years old. (ECF No. 161-1 ¶ 21.) She claims that her adoptive parents fraudulently opened various accounts in her name. (ECF No. 162-1 ¶¶ 2–3.)[2] The allegedly fraudulent accounts include credit cards and loans ("tradelines") opened between 2015 and 2018. Johns discovered the alleged fraud in July 2018. (ECF No. 160-1 ¶ 22.) She has known since at least 2018 that these tradelines were listed as hers on her credit report. (ECF No. 162-1 ¶ 3.) Johns went to the Philadelphia Police Department to report the alleged identity theft on July 30, 2018. (ECF No. 160-1 ¶ 23.) Criminal charges were never brought against her parents. (*Id.*) Johns testified that she received a copy of the 2018 incident report resulting from her report

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.
[2] Equifax does not dispute that Johns is a victim of identity theft. (ECF No. 164-1 ¶ 4.) The remaining Summary Judgment Defendants do dispute this fact. (*See, e.g.*, ECF No. 159-1 ¶ 4; ECF No. 136-4 at 6; ECF No. 134-2 at 15–16; ECF No. 129-3 at 8–9; ECF No. 158-1 at 11–12.)

to the police in late 2021 (the "2018 Incident Report"). (ECF No. 196 at 36.) Defendants assert the 2018 Incident Report is illegible.

### 1.   Tradelines

As relevant to these motions, the tradelines at issue include a series of Nelnet loans (opened before 2020), a Santander loan, a credit card from First Premier, and a credit card from Credit One Bank. (ECF No. 77 ¶ 18; *see* ECF No. 160-1 ¶ 101.)

#### a)   *Student Loans*

In August 2015, Johns enrolled as a student at Saint Joseph's University ("SJU"). (ECF No. 162-1 ¶ 5.) She continued her education there through December 2016 but did not graduate nor receive a degree.[3] (*Id.* ¶ 6.) To finance her education at SJU, on August 11, 2015, a Master Promissory Note under the William D. Ford Federal Direct Loan Program (the "MPN") was executed in Johns's name in favor of the U.S. Department of Education ("Department of Education"). (*Id.* ¶ 15; ECF No. 132-5.) The MPN has Johns's electronic signature on it, but she denies signing it. (ECF No. 160-1 ¶ 16.) Johns asserts that the email address and phone number associated with the account did not belong to her. (ECF No. 215 at 3.) Johns also testified that she did not have an email address or phone number in 2015. (ECF No. 196-9 at 50.)

A total of four loans were disbursed to SJU from the MPN on October 28, 2015 ($2,750), January 26, 2016 ($2,750), and January 25, 2017 ($3,250) (collectively, "SJU Loans"). (ECF No. 129-12 at 2–3.) Johns testified that she was informed that her parents would be paying for her attendance at SJU. (ECF No. 158-2 ¶ 6.) All four of the SJU Loans were reported as satisfactory

---

[3] There is a dispute of fact as to why Johns left SJU. She asserts that it was because tuition payments were not being made. (ECF No. 197-1 ¶ 5.) Nelnet asserts that no evidence of record supports this and instead points to deposition testimony with a different explanation for her departure from SJU. (*Id.*) However, why Johns left SJU is not material to the present motions.

accounts in her credit report at all relevant times. (ECF No. 160-1 ¶ 14; ECF No. 162-1 ¶ 187.) Johns was aware that the SJU Loans were being reported on her credit report by at least May 19, 2020. (ECF No. 162-1 ¶ 85; ECF No. 132-6 at 8–10.)

On September 1, 2020, Johns enrolled as a student at Ultimate Medical Academy ("UMA"). (ECF No. 162-1 ¶ 9.) Johns does not dispute borrowing loans from the Department of Education to finance her education at UMA. (*Id.* ¶ 65.) At the time she enrolled at UMA, she completed entrance counseling for the purpose of receiving direct loans from the Department of Education. (*Id.* ¶ 26.) Johns signed the entrance counseling documents and completed the accompanying questionnaire. (*Id.* ¶ 28.) As part of that entrance counseling, Johns expressly acknowledged and was advised that "[m]ost schools are authorized to make multiple federal student loans under one MPN for up to 10 years"; "[i]f you don't want to receive more than one federal student loan under the same MPN, you must notify your school or your servicer in writing each academic year. You will have to sign a new MPN for each loan you receive"; and "[c]opies of your Master Promissory Note are available at www.studentloans.gov if you complete your MPN electronically." (*Id.* ¶ 29.) Despite knowing that her SJU loans were appearing on her credit reports and believing at that time that her identity had been stolen, Johns did not notify her school nor servicer that she wanted to sign a new MPN. (*Id.* ¶ 30.)

On the same day she completed entrance counseling, Johns accepted an award of financial aid from the Department of Education via letter. (*Id.* ¶ 31.) The Frequently Asked Questions portion of that letter stated: "Your Master Promissory Note explains the terms and conditions of your loans in which you have promised to repay your lender or loan holder." (*Id.* ¶ 32.) Johns affirmed that she reviewed this portion of the letter. (*Id.* ¶ 33.)

On October 6, 2020, Nelnet sent four letters to Johns on Department of Education letterhead advising her that each of her four then-outstanding loans from her attendance at SJU would be deferred due to her new school enrollment. (*Id.* ¶ 37.) A few days later, UMA sent Johns a notice related to her student loan financing, which included her "Previous Loan History" listing a combined total of $8,750 in "Current Loan Responsibility." (*Id.* ¶ 38–39; ECF No. 132-10 at 3–4.) A total of five loans were disbursed to UMA from November 17, 2020 through May 2021. (ECF No. 162-1 ¶¶ 43, 48, 51, 58.[4]) These five loans are categorized as three separate loan "accounts." (ECF No. 129-12 at 3–4.) With the various loan disbursements, Johns received notices from UMA which stated that "Your Master Promissory Note explains the terms and conditions of your loans in which you have promised to repay your lender or loan holder," and providing her "Previous Loan History." (ECF No. 162-1 ¶¶ 47–62; *e.g.*, ECF No. 132-13 at 5; ECF No. 132-14 3–4.)

On July 7, 2023, Johns enrolled at DeVry University ("DeVry") and borrowed two loans under the MPN to finance her education. (ECF No. 162-1 ¶¶ 67–68; ECF No. 129-12 at 4.) Johns does not dispute borrowing loans from the Department of Education to pay her tuition at DeVry. (ECF No. 162-1 ¶ 70.)

Nelnet is the servicer for the SJU, UMA, and DeVry loans. (*Id.* ¶ 75.) Johns always reviews the emails she receives from Nelnet. (*Id.* ¶ 74.) Johns also has full electronic access to her student loan accounts, and has since at least August of 2020. (*Id.* ¶ 73.) Her parents originally created the Nelnet account online, but Johns has since taken over online account and changed the password. (*Id.* ¶ 15.)

---

[4] The Court cites to Johns's Response to Nelnet's Statement of Material Facts as it contains both Nelnet's fact and Johns's response. However, the Court notes that after paragraph 45, Johns's responses no longer align with the numbered paragraphs from Nelnet's original filing.

### b)    *Santander*

In July 2016, Johns went to a car dealership with her parents where they purchased a car. (ECF No. 160-1 ¶ 4.) Johns was nineteen years old at the time. (ECF No. 129-4 at 4.) While at the dealership, Johns's parents asked her to sign some documents, which she did without reading them or asking questions. (ECF No. 160-1 ¶ 5.) These documents included a Retail Installment Sale Contract with Johns as a co-buyer for the vehicle along with her parents. (*Id.* ¶ 6.) Johns testified that her parents "were just very emotionally and physically abusive people" and that "we did what we were told." (ECF No. 140-31 at 40.) The Santander tradeline was reported as current and paid on her credit report. (ECF No. 161-1 ¶ 28.)

### c)    *First Premier Credit Card*

On March 9, 2018, First Premier approved a credit card account ending in -8417 in Johns's name. (ECF No. 165-1 ¶ 1.) The account was opened via online application using Johns's correct social security number, date of birth, and address. (*Id.* ¶ 2.) The online application used the email address srjohns29@gmail.com. (ECF No. 136-5 at 2.) The application listed Sharlise Johns as an authorized user. (ECF No. 165-1 ¶ 3.) Johns asserts that the account was opened with a phone number that belonged to her father. (ECF No. 192 ¶ 81.) The account became delinquent as a result of unpaid charges, and First Premier charged it off on June 28, 2018. (*Id.* ¶¶ 5–7.)

Johns asserts that one of the charges associated with the account is a charge with Buick. (ECF No. 165-1 ¶ 85.) She points to First Premier's deposition testimony in support of this assertion. The testimony at issue involves First Premier's witness reading off an exhibit not in this record regarding a charge to Granite Run Buick GMC for "494.86, maybe," while noting "I can't quite read it." (ECF No. 215-1 at 41–42.)

6

### d)    *Credit One Credit Card*

On March 11, 2018, a credit card account with Credit One Bank, N.A. ("Credit One") with an account number ending in -2997 was opened in Johns's name, using her correct date of birth and social security number. (ECF No. 163-1 ¶ 1; ECF No. 134-6 at 14–15.) The email address associated with the account was srjohnss30@aol.com. (ECF No. 191 ¶ 36.) The Credit One card was used to make purchases, and payments were made towards the credit card balance. (ECF No. 163-1 ¶ 3.)

On August 23, 2019, Credit One charged off the account with an unpaid balance of $348.07. (*Id.* ¶ 4.) Through a series of assignments, the Credit One account was sold and assigned to LVNV on September 17, 2019. (*Id.* ¶ 5.) Resurgent manages LVNV's accounts, and all actions taken with respect to LVNV's accounts, including credit reporting, are performed by Resurgent. (*Id.* ¶ 7.)

### 2.    Disputes

Both credit reporting agencies ("CRAs") and data furnishers ("furnishers") have access to the e-OSCAR system. (ECF No. 165-1 ¶¶ 8–9.) The e-OSCAR system, the industry standard in the consumer reporting industry for reinvestigations, is used to transfer information between CRAs and furnishers regarding consumer credit reporting disputes. (*See id.* ¶ 10; ECF No. 160-1 ¶ 32.) Generally, when a CRA receives a consumer dispute, it will send an Automated Consumer Dispute Verification ("ACDV") to furnishers in the e-OSCAR system. (*See* ECF No. 165-1 ¶ 11.) CRAs can also include attachments received from the consumer with the ACDV transmission through e-OSCAR.

CRAs receive account-related information from furnishers. (ECF No. 161-1 ¶ 5.) There is no dispute that Equifax and TransUnion are CRAs, and that First Premier, Nelnet, and Resurgent

are furnishers. Johns and LVNV dispute whether LVNV is a furnisher within the meaning of the FCRA. (ECF No. 134-2 at 12–13; ECF No. 163 at 7.)

From 2018 through 2022, Johns disputed the tradelines at issue with the Summary Judgment Defendants. Johns engaged counsel in 2019, who assisted her with these disputes. (ECF No. 160-1 ¶¶ 41, 51, 60, 68.)

### a)      *TransUnion*

TransUnion's policies and procedures provide for the following steps in processing a consumer dispute. Johns does not dispute that these are TransUnion's policies, but disputes that the policies were followed in her case. Pursuant to TransUnion's policies and procedures, when processing a written dispute from a consumer, an agent will first obtain sufficient information about the consumer from the dispute to allow the agent to access that consumer's TransUnion file. (ECF No. 160-1 ¶ 28.)[5] Once the consumer's file is accessed, the agent reviews the contents of the consumer's communications to determine what type of assistance is being sought, and reviews any supporting documentation provided by the consumer. (*Id.* ¶ 29.) If supporting documents are provided, the agent will determine if those documents can be used to make the update the consumer is requesting. (*Id.* ¶ 30.) If TransUnion is not able to update the consumer's file based on the

---

[5] Johns objects to a declaration that TransUnion attaches to its summary judgment motion (the "Wagner Declaration," ECF No. 140-3) on the basis that it uses an electronic signature. She asserts an electronic signature is inappropriate for non-attorney declarations. (ECF No. 160-1 ¶ 25.) She raises similar objections in response to the Gray Declaration attached to TransUnion's summary judgment motion. In support, Johns cites to cases from the District of New Jersey and the Eastern District of Michigan, both of which find electronic signatures inappropriate for non-attorney declarations based on those courts' local rules. *See United States v. $144,650 in U.S. Currency*, No. CIV.A. 12-5690, 2013 WL 6384646, at *4 (D.N.J. Dec. 6, 2013); *Johnson v. Ford Motor Co.*, No. 17-CV-11412, 2019 WL 78893, at *7 n.3 (E.D. Mich. Jan. 2, 2019). However, the Eastern District of Pennsylvania has no comparable local rule. The Court is satisfied that the Wagner Declaration can properly be relied on as it does not violate any local rule of this Court, and the electronic signature is accompanied by a statement that it is sworn under penalty of perjury.

information submitted by the consumer, it will contact the furnishers via ACDV to explain the dispute and ask for a response concerning the accuracy or completeness of the disputed item. (*Id.* ¶¶ 31–34.) When TransUnion receives the response from the furnishers, it either verifies, updates, or deletes information in TransUnion's records in accordance with its process and procedures. (*Id.* ¶ 36.)

In August 2018, Johns contacted TransUnion by telephone, where she requested a credit file disclosure. (*Id.* ¶ 40.)[6] TransUnion sent a letter requesting proof of address from Johns, but did not receive the address confirmation needed in order for it to send the disclosure. (*Id.*) Johns believes she received her TransUnion credit file disclosure on May 19, 2020. (*Id.* ¶ 43.) This disclosure listed each of the accounts she would later dispute. (*Id.*)

On May 25, 2020, Johns submitted her first dispute with TransUnion concerning the LVNV and Credit One tradelines, and a tradeline not at issue in this case. (*Id.* ¶ 45.) She disputed the LVNV account as "Not aware of collection" and the other accounts as "Not his/hers." (ECF No. 140-5.) Her dispute did not attach any documentation. (ECF No. 160-1 ¶ 48.) TransUnion sent ACDVs to the relevant furnishers and processed their responses. (*Id.* ¶¶ 48–49.) On June 13, 2020, TransUnion sent the results of the investigation to Johns. (*Id.* at ¶ 50.) Johns asserts that Credit One responded to this ACDV instructing TransUnion to delete the account. (ECF No. 191 ¶ 34; ECF No. 163-4.)

---

[6] Johns objects to this statement of fact under the Best Evidence Rule. Federal Rule of Evidence 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required" unless an exception applies. This rule does not prohibit a witness from testifying as to their personal knowledge simply because that testimony can also be supported by written documentation. *See Willis v. BW IP Intern. Inc.*, 811 F. Supp. 2d 1146, 1155 (E.D. Pa. 2011). Here, the declarant's averment is based on his personal knowledge in his capacity as a Specialist III at TransUnion. (ECF No. 140-3 ¶ 1.) Thus, the documents are not required to establish his personal knowledge of them. However, the declaration cannot be used to support the contents of the documents without attaching the underlying documents.

Johns submitted a second dispute on August 25, 2020 concerning the Capital One, Credit One, LVNV tradelines, and three tradelines not at issue in this case.[7] (ECF No. 160-1 ¶ 52.) This dispute attached a letter stating: "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." (ECF No. 140-8.) She attached copies of her identification and social security cards. (*Id.*) The third dispute, submitted on October 23, 2020, concerned the same accounts as the second dispute. (ECF No. 160-1 ¶ 61.) The same[8] attachments were included. (ECF No. 140-12.) During the second and third reinvestigations, TransUnion sent postcards to Johns requesting proof of her address and did not receive that requested proof before concluding those reinvestigations. (ECF No. 160-1 ¶¶ 57, 63.) Again, for both the second and third disputes, TransUnion sent ACDVs to furnishers, then received and processed the responses, and sent Johns the results of the reinvestigation. (*Id.* ¶¶ 54–56, 58, 64–66.)

The fourth dispute, filed on February 16, 2021, concerned the First Premier, LVNV, Santander, and Nelnet accounts. (*Id.* ¶ 69.) This dispute attached a letter again stating: "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." (ECF No. 140-16.) A copy of her identification card was also attached. (*Id.*) TransUnion again sent ACDVs to furnishers, then received and processed the responses, and sent Johns the results of the reinvestigation. (ECF No. 160-1 ¶¶ 71–73.)

The final dispute, submitted on August 16, 2022, again concerned the First Premier, LVNV, Santander, and Nelnet accounts. (*Id.* ¶ 85.) The final dispute included the 2018 Incident

---

[7] TransUnion states that Johns did not dispute the Santander account in the second dispute. Despite this, TransUnion sent an ACDV to Santander as a part of the second dispute and verified this account as accurate. (ECF No. 160-1 ¶¶ 52, 54, 56.)

[8] The letter included in both disputes are identical aside from the date of the letter.

Report. (ECF No. 140-20.) The dispute agent noted "Account listed in the consumer's correspondence that reflects at least 12 months of good payment history[.] Report date illegible hence not updated." (ECF No. 140-21 at 2.) TransUnion sent ACDVs and the attachments to Comenity Capital Bank and First Premier and processed their responses. (ECF No. 160-1 ¶¶ 88, 91.) On August 22, 2022, TransUnion sent a letter to Johns advising her that it declined to block the information identified because it determined her "request has either a) been made in error; b) is a misrepresentation of material fact relevant to the request to block and/or c) you have obtained possession of goods, services or money as a result of the transaction issue." (ECF No. 140-23 at 2.) The letter also noted that TransUnion added to her credit report "an Extended Fraud Alert." (*Id.*) On September 4, 2022, TransUnion sent Johns the results of its reinvestigation of the final dispute. (ECF No. 160-1 ¶ 91.) Johns had no further contact with TransUnion. (*Id.* at ¶ 98.)

### b)    *Equifax*

When Equifax receives a dispute from a consumer, it opens a dispute case. (ECF No. 161-1 ¶ 13.) Equifax asserts that it then conducts a review of the consumer's credit file and any supporting documentation a consumer included with their dispute, and makes updates based on information provided by the consumer if it is able to do so based on its applicable policies. (*Id.* at ¶¶ 14–15.) If Equifax determines that further investigation is required, it will send an ACDV to the applicable furnishers. (*Id.* ¶¶ 16–17.) If a furnisher advises Equifax to delete, update, or modify the account information, Equifax will review the furnisher's response in conjunction with its own policies and procedures to take the requisite action. (*Id.* ¶ 19.) When Equifax completes a reinvestigation, it sends to the consumer the results, a summary of the consumer's rights under the FCRA, additional steps the consumer may take, and a description of the procedures used to reinvestigate the dispute. (*Id.* ¶ 20.) Equifax testified that as a matter of policy, after an account

has already been disputed twice, it will not take any action on a third dispute without additional relevant information being provided. (ECF No. 164-1 ¶ 18.)

In 2018,[9] Johns made her first dispute with Equifax, claiming that the First Premier, Santander, and Credit One tradelines, and one tradeline not at issue in this case, were the result of identity theft. (ECF No. 161-1 ¶ 42.) Johns did not include any documents with this dispute. (*Id.* ¶ 43.) All of the furnishers verified that the accounts were properly associated with Johns. (*Id.* ¶ 47.) Pursuant to Equifax's policy, the tradeline not at issue in this case was removed from Johns's file, even though the data furnisher had verified it. (*Id.* ¶ 48.) On August 24, 2018, Equifax emailed Johns the investigation results showing that First Premier, Santander, and Credit One tradelines were verified as belonging to her. (*Id.* ¶ 49.) The results included a full credit file, which included Johns's existing Nelnet loans. (*Id.* ¶ 50.)

Johns submitted a second dispute in August 2020 concerning the Credit One, First Premier, and LVNV tradelines, and three tradelines not at issue in this case. (*Id.* ¶ 51.) The dispute included a letter from Johns stating: "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." (*Id.*) Johns believed at the time that her parents had opened the accounts in her name, but she did not include that information in her August 2020 dispute to Equifax. (*Id.* ¶ 56.) Johns also attached copies of her identification card and social security card. (*Id.* ¶ 52.) Equifax sent ACDVs to the furnishers. (*Id.* ¶ 53.)

The third dispute, filed in October 2020, concerned the same accounts as the August 2020 dispute. (*Id.* ¶ 57.) This dispute was accompanied by a nearly identical letter and the same

---

[9] Equifax asserts that Johns made a phone dispute to Equifax in August 2018. Johns asserts that Equifax's 30(b)(6) witness testified that she believed the first correspondence from Johns was mail correspondence received around February 2018. (ECF No. 161-1 ¶ 42.) The specific month is not material to the present motions. Further, neither party asserts that the means by which a dispute was made is material to the present motions.

identification and social security card copies. (ECF No. 131-9; ECF No. 161-1 ¶¶ 59–60.) The fourth dispute, filed in January 2021, concerned the First Premier, LVNV, Santander, and Nelnet accounts. (ECF No. 161-1 ¶ 64.) Equifax received its last dispute from Johns on August 17, 2022, which included the 2018 Incident Report for the first time. (*Id.* ¶ 71.) Equifax sent written correspondence to Johns on August 23, 2022, in which it asserts it informed her that Equifax was not blocking the tradelines. (*Id.* ¶ 76.)[10]

For each dispute received, Equifax asserts it reinvestigated pursuant to its policies, and sent the results of said investigation to Johns. (*Id.* ¶¶ 55, 61, 68, 77.)

### c)     *First Premier*

When First Premier receives identity theft or fraud disputes from CRAs through e-OSCAR, it assigns each dispute to an investigator in its Security Department. (ECF No. 165-1 ¶ 12.) The investigator confirms the cardholder's identifying information, such as full name, social security number, and date of birth, to determine if the information between the original account application and the ACDV matches. (*Id.* ¶ 16.) The investigator also reviews the Customer Identification Program data which documents the verification of the consumer's identity at the time the account was opened. (*Id.* ¶ 19.) Additionally, the investigator uses a third-party database, such as LexisNexis Risk Solutions or Innovis, to verify that the consumer is linked to the address on file. (*Id.* ¶ 20.)

---

[10] Johns objects to this and other statements of fact under the Best Evidence Rule. Often, the declarant's averment is based on her personal knowledge as the Litigation Support Lead for Equifax. (ECF No. 131-3 ¶ 2.) This fact, as well as others objected to on the same grounds, are admissible as to her personal knowledge. *See supra* note 6. As it relates to the August 23, 2022 correspondence to Johns, because Equifax cannot establish the contents of the document based on the declaration, it remains disputed whether this correspondence informed Johns that Equifax was not applying a block under the FCRA and its internal policies.

13

The investigator also reviews any documentation provided with the ACDV and "the Fair Credit Reporting Act ('FCRA') relevant information." (*Id.* ¶ 17.) The investigator reviews internal account notes such as any history of returned mail or direct communication from the consumer. (*Id.* ¶ 18.) While prior ACDV responses are contained in the file notes, pursuant to First Premier's procedures, investigators do not rely on prior ACDV responses when making their determinations, and treat each new dispute as a new investigation. (*Id.* ¶¶ 13–14.)

Between August 4, 2018, and August 22, 2022, First Premier received sixteen ACDVs from CRAs of Johns's disputes. (*Id.* ¶ 22.) Specifically, the disputes were received on August 4, 2018, May 20, 2020, June 4, 2020, August 29, 2020, August 29, 2020, September 4, 2020, October 27, 2020, October 29, 2020, October 30, 2020, January 25, 2021, January 30, 2021, January 30, 2021, February 18, 2021, August 18, 2022, August 19, 2022, and August 24, 2022. (ECF No. 136-3 ¶¶ 21, 28, 31, 34, 37, 40, 43, 46, 49, 52, 55, 58, 61, 64, 67, 70.) Of the sixteen disputes, the first, second, third, twelfth, fourteenth, and fifteenth disputes contained no attachments. (*Id.* ¶ 23.) The remaining disputes included a letter that claimed that Johns was a victim of identity theft and copies of Johns's identification and social security cards. (*Id.* ¶ 25.) The sixteenth dispute also attached the 2018 Incident Report. (ECF No. 165-1 ¶ 41.) The ACDV with the second dispute noted that "the account was opened fraudulently by my parents without my knowledge." (ECF No. 136-7 at 2.)

For each ACDV received, First Premier followed the above-listed investigation procedures. (ECF No. 165-1 ¶ 21.) First Premier added the "XB" compliance condition code to the tradeline, which is reflected beginning at least by June 5, 2020.[11] This compliance code states:

---

[11] The majority of the ACDVs reflect the XB code. (ECF Nos. 136-7 at 3; 136-8 at 3; 136-9 at 3; 136-10 at 3; 136-11 at 3; 136-12 at 3; 136-13 at 3; 136-14 at 3; 136-15 at 3; 136-16 at 3; 136-18 at 3; 136-19 at 3; 136-21 at 3.) Three of the sixteen ACDVs do not reflect an XB code: the first,

14

"XB: Account information disputed by consumer under the Fair Credit Reporting Act." (*See, e.g.*, ECF No. 136-7 at 3.)

### d)      LVNV and Resurgent

On May 25, 2020, Resurgent received a notice of dispute from Equifax. (ECF No. 163-1 ¶ 11.) The dispute code identified on the ACDV stated: "Not his/hers. Provide or confirm complete ID." (ECF No. 134-9 at 2.) No other information or documents were included with the ACDV. (ECF No. 163-1 ¶ 12.) Resurgent investigated the dispute by comparing its information about the Credit One account with the information Johns provided to Equifax, and confirmed that the information from the account matched what Johns provided to Equifax. (*Id.* ¶¶ 13–14.)

On June 9, 2020, Resurgent received a letter from Johns requesting specific information regarding "a credit report listing that appears as Lvnv Funding Llc within my consumer files." (ECF No. 134-10 at 2.) Resurgent responded on July 27, 2020, stating that "[a]fter reviewing this dispute, we have reason to believe that it was submitted by, prepared on your behalf by, or submitted on a form supplied to you by a credit repair organization. Therefore, as permitted by law, we have determined your dispute to be frivolous and irrelevant and will not investigate it." (ECF No. 134-11 at 2.)

On August 29, 2020, Resurgent received a notice of dispute from TransUnion. (ECF No. 134-12 at 2.) The ACDV identified the dispute as "Claims true identity fraud, account fraudulently opened." (*Id.*) Resurgent and Johns agree, but the record citation does not support, that the dispute was accompanied by a letter stating: "I've been the victim of identity theft. These accounts were

---

twelfth, and fifteenth. The twelfth and fifteenth disputes were received either on the same day or within a day of another ACDV which does reflect the XB code. Thus, it is apparent that the XB code was reflected on the tradeline beginning at least by June 5, 2020, when First Premier responded to the second dispute. (ECF No. 136-7.)

not opened by me, and should be removed from my credit profile." (ECF No. 163-1 ¶ 18.) Resurgent investigated the dispute by comparing its information with the information Johns provided to the CRAs to confirm the information was the same, and by reviewing account-related documents such as billing statements for signs of potential identity theft. (*Id.* ¶¶ 19–20.) After completing its investigation, Resurgent could not substantiate that the account was the result of identity theft. (*Id.* ¶ 21.) As part of the investigations, Resurgent reviewed the documents and information it obtained from Credit One, but it is disputed whether Credit One had any information or documents that Resurgent did not possess. (*Id.* ¶ 8.)

On September 20, 2020, Resurgent received a notice of dispute from Equifax. (*Id.* ¶ 22.) The ACDV again coded the dispute as "Claims true identity fraud, account fraudulently opened," and no additional documents or information were provided. (*Id.*) Resurgent responded on October 7, 2020 with code "23: Disputed information accurate. Updated account information unrelated to the dispute." (ECF No. 134-13 at 2.) Resurgent received subsequent dispute ACDVs from CRAs on October 27, 2020, October 29, 2020, January 25, 2021, January 31, 2021, February 18, 2021, and March 9, 2021. (ECF No. 163-1 ¶ 29.)

On October 20, 2020, Resurgent sent Johns a letter informing her that it determined the information provided was insufficient to support her claim of identity theft, and stating: "If further investigation is desired, please provide one or more of the following documents," identifying types of documents she could provide to Resurgent if she desired further investigation, such as a police report or court documents. (*Id.* ¶ 24.) The letter also provided a blank copy of an identity theft affidavit. (*Id.* ¶¶ 24–25.) Johns testified that she believes she remembers receiving this letter. (ECF No. 196-9 at 82.) She testified that she is not sure if she ever provided Resurgent with anything in response to the letter. (*Id.*) Johns also testified that she believes she spoke with Resurgent on the

16

phone, but does not recall when, and did not testify as to what information she believes she may have provided in any phone call. (*Id.* at 84.) No evidence suggests that LVNV or Resurgent received the 2018 Incident Report.

### e)    *Nelnet*

In general, Nelnet's process for indirect disputes[12] received from CRAs is as follows: Indirect disputes that Nelnet receives from a CRA are initially handled by its enrollment processing department. (ECF No. 162-1 ¶¶ 76–77.) If the enrollment processing department determines that a dispute includes documentation supporting a claim of fraud or identity theft, such as a police report or other testimony from the borrower, the dispute is forwarded to Nelnet's financial crimes risk management team ("FCRM"). (*Id.* ¶ 78.) Nelnet's 30(b)(6) witness testified that the FCRM team "then does an in depth review of the account to determine if there is evidence of identification theft." (ECF No. 132-19 at 8.) Nelnet further testified that this in-depth review includes reviewing the entirety of the borrower's account and servicing history, the master promissory note, school enrollment, address history, phone numbers, and email addresses. (*Id.* at 10.) If a tradeline in dispute involves a loan made by the Department of Education, FCRM also sends the borrower a forgery packet and application. (ECF No. 162-1 ¶ 81.) FCRM sends the results of its investigation back to enrollment processing for purposes of responding to the indirect dispute from the CRA. (*Id.* ¶ 82.) If Nelnet receives identical successive disputes from the same CRA and the borrower has provided no new information, Nelnet relies on results from its initial investigation for the latter dispute. (*Id.* ¶ 83.) When an investigation does not yield the result the consumer sought, Nelnet

---

[12] In addition to the indirect disputes Nelnet received from CRAs detailed in this section, Johns testified that she provided new documents directly to Nelnet on various occasions. (*See* ECF No. 162-1 ¶ 159.) One exhibit lists various documents provided on October 28, 2022. (ECF No. 162-5.) The underlying documents referenced in that exhibit are not included in the summary judgment record.

17

changes the compliance condition code to XC, which indicates that it completed an investigation but the consumer disagreed with the outcome. (*Id.* ¶ 84.)

When Johns began submitting disputes for tradelines she asserts were the result of identity theft, her early disputes did not include any Nelnet loans. For example, Johns's August 17, 2020 dispute did not include the Nelnet loans, even though the dispute was submitted after she filed a police report in 2018 and was aware the SJU Loans were included in her TransUnion Credit Report. (*Id.* ¶ 85; ECF No. 132-21 at 2.) Similarly and inexplicably, her October 15, 2020 dispute did not include the Nelnet loans. (ECF No. 162-1 ¶ 86; ECF No. 132-22 at 2.)

In August 2020, Nelnet received a notification from the Federal Government via the Common Origination Distribution system indicating that the Federal Government had received an updated email address, phone number, and address. (ECF No. 207-2; ECF No. 132-19 at 13–14.)

On January 25, 2021, Nelnet received five ACDVs from Equifax resulting from Johns's dispute of Nelnet loan accounts ending in 5131, 1431, 1331, 9829, and 9729 ("First Nelnet Dispute"). (ECF No. 166-1 ¶ 10; ECF No. 197-1 ¶ 10;[13] ECF No. 132-23.) This dispute consisted solely of a copy of Johns's social security card and a letter stating: "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." (ECF No. 162-1 ¶¶ 89–90.) The letter lists Nelnet among the disputed tradelines and states "(All four accounts)." (ECF No. 132-23 at 5.) By January 25, 2021, Johns had taken out at least one loan to attend UMA. (ECF No. 129-12 at 3.)

---

[13] Johns failed to attach her separate Statement of Material Facts in support of her Partial Motion for Summary Judgment against Nelnet. (ECF No. 139.) In Nelnet's opposition, it attempted to respond to enumerated material facts to the best of its abilities. (ECF No. 158-2.) Two days after Nelnet's opposition, and recognizing the error, Johns filed a letter seeking to belatedly attach the Statement of Material Facts. (ECF No. 166.) Nelnet again responded to these facts in its sur-reply, with reference to its earlier response. (ECF No. 197-1.) The Court deems all of Nelnet's responses to Johns's Statement of Facts to be timely.

Upon receipt of this notice of dispute, Nelnet's enrollment processing department referred the investigation to its FCRM team. (ECF No. 162-1 ¶ 94.) The FCRM team ordered a TransUnion Locator Services Report and compared it to the MPN in its consumer verification database to confirm the addresses matched and that Johns had a consistent history at that address. (*Id.* ¶ 95; ECF No. 132-19 at 16–17.) The mailing address listed on the MPN was correct. (ECF No. 162-1 ¶ 100.) On January 28, 2021, Nelnet responded to the ACDV with Code "23: Disputed Information accurate. Updated account information unrelated to the dispute." (*Id.* ¶ 105.) Nelnet also updated Johns's account to reflect a compliance code of "XC: Completed investigation of FCRA dispute—consumer disagrees." (*Id.* ¶ 106.) Nelnet also sent a letter to Johns explaining the basis of the denial, inviting her to submit her request to the CRAs to reinvestigate with new documentation to dispute Nelnet's finding, and a forgery packet, consistent with its policies and procedures. (*Id.* ¶¶ 107–08.)

On January 30, 2021, Nelnet received five ACDVs from Experian ("Second Nelnet Dispute"). (*Id.* ¶ 111; ECF No. 132-28.[14]) The notice of dispute consisted of Johns's identification, social security card, and a letter stating: "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." (ECF No. 162-1 ¶¶ 113–14.) The letter again lists Nelnet among the disputed tradelines and states "(All four accounts)." (ECF No. 132-28 at 5.) Nelnet's enrollment processing department again referred the investigation to FCRM. (ECF No. 162-1 ¶ 118.) The FCRM team notated the dispute as "frivolous," which "largely means that there was no new information from a previous dispute." (ECF No. 132-19 at

---

[14] While Nelnet cites to ECF No. 132-25 as the ACDV responses for the Second Nelnet Dispute, ECF No. 132-28 lists the correct CRA, date, and attachments as described for the Second Nelnet Dispute.

25–26.) On February 1, 2021, Nelnet responded to the ACDV with Code "01: Account information accurate as of date reported." (ECF No. 162-1 ¶ 122.)

Also on January 30, 2021, Nelnet received a notice of dispute from Equifax related to five Nelnet loans ("Third Nelnet Dispute"). (*Id.* ¶ 124; ECF No. 132-25.[15]) On February 1, 2021, Nelnet responded to the ACDV with Code "01: Account information accurate as of date reported." (ECF No. 162-1 ¶ 131.)

On February 18, 2021, Nelnet received a notice of dispute from TransUnion ("Fourth Nelnet Dispute"). (*Id.* ¶ 133; ECF No. 132-27.) This dispute included six ACDVs in total, which included the same five accounts as before as well as an account ending in 3931. (ECF No. 197-1 ¶ 14.) On February 26, 2021, the accounts were verified using the same code "01." (ECF No. 197-1 ¶ 14.)

On August 18, 2022, Nelnet received a notice of dispute from Experian ("Fifth Nelnet Dispute"). (ECF No. 162-1 ¶ 146; ECF No. 132-29.) Similarly, on August 19, 2022, Nelnet received a notice of dispute from Equifax ("Sixth Nelnet Dispute"), in which the ACDVs noted that it was received from "EXP." (ECF No. 162-1 ¶ 160; ECF No. 129-31.) Both disputes included seven ACDVs each. (ECF No. 132-29; ECF No. 132-31.) In sending these ACDVs, Experian selected Dispute Code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." (ECF No. 162-1 ¶¶ 147, 161.) There were no attachments to either of these disputes. (*Id.* ¶¶ 148, 162.) Nelnet's enrollment processing department again referred the investigation to its FCRM team. (*Id.* ¶¶ 151, 165.) On August 23, 2022, Nelnet responded to the ACDVs with Code "01: Account information accurate as of the date reported." (*Id.* ¶¶ 155, 169.)

---

[15] Similarly, here, Nelnet cites to ECF No. 132-27 as the ACDV responses for the Third Nelnet Dispute, but that exhibit appears to be the Fourth Nelnet Dispute based on the CRA who sent it and the date.

Nelnet again sent Johns a letter for each dispute explaining the basis for the denial of her claim and inviting her to submit another request to CRAs with new documentation. (*Id.* ¶¶ 157–58, 171.)

On September 7, 2022, Nelnet received from Innovis Consumer Assistance a letter[16] from Johns stating: "I've been the victim of identity theft and fraud. These accounts were not opened by me, and should be removed from my credit profile." (ECF No. 132-33 at 3.) Included with the letter were copies of Johns's identification card, social security card, and the 2018 Incident Report. (*Id.* at 4–6.) Nelnet asserts it reviewed the account and denied the request as a result of the FCRM team's prior investigations, while Johns asserts Nelnet denied the dispute because it did not receive a fraud application packet. (ECF No. 162-1 ¶ 177.)

### 3.    Johns's Alleged Damages

Johns asserts that as a result of Defendants' violations of the FCRA and FDCPA, she was denied credit cards and car loans, had difficulty getting an apartment, was prevented from job opportunities, and suffered emotional distress. (ECF No. 165-1 ¶ 62; ECF No. 160-1 ¶ 102.) Johns testified that she never tried to purchase a car because she felt anxious and because she already had an auto loan in her name. (ECF No. 165-1 ¶ 63.) Notably, Johns does not currently have, nor has she ever had, a driver's license. (ECF No. 160-1 ¶ 107.)

### a)    *Credit Cards and Car Loans*

The parties have noted the following credit card and car loan denials:

- On August 4, 2018, American Express denied Johns's application for a credit card due to her FICO score, which it obtained from Experian. (ECF No. 131-16 at 2.)

---

[16] Nelnet refers to this communication as a "trade block notification," while Johns asserts it is "a dispute correspondence, just like all other correspondences." (ECF No. 162-1 ¶ 173.) The exhibit containing the dispute communication does not contain ACDVs. (ECF No. 132-33.)

- On August 11, 2020, Discover denied Johns's application for a credit card due to: (1) derogatory public record or collection filed; (2) lack of recent revolving account information; and/or (3) length of time accounts have been established. (ECF No. 131-17 at 2.) The denial letter goes on to say that Discover's decision "was based in whole or in part on information obtained in a report from the consumer reporting agency listed below," where below it lists Experian. (*Id.* at 3.)

- In August 2020, Plaintiff was denied application from Citibank for a Diamond Preferred Card, Chase for a Freedom Card, and American Express. (ECF No. 161-1 ¶ 82; ECF No. 131-19.) None of these denials provide the reason for the determination. (ECF No. 131-19.) Johns testified that she applied for credit in August 2020 not because she needed the credit, but rather as a way to see if she would qualify for credit. (ECF No. 161-1 ¶ 83.)

- On September 27, 2020, May 8, 2023, and May 10, 2023, Exeter denied Johns's applications for credit for automobile financing. In 2020, the denial letter states her credit score as obtained from TransUnion and lists four factors adversely affecting her credit. (ECF No. 131-18 at 2.) On May 8, 2023, two letters state her credit score as obtained by Experian and list four factors adversely affecting her credit: lack of sufficient relevant real estate account information, insufficient number of on-time payments, balances of open accounts too high compared to loan amounts, and the amount paid down on her open installment accounts is too low. (*Id.* at 4, 6.) On May 10, 2023, two letters state her credit score as obtained by Experian and list the same four factors as the May 9 letters. (*Id.* at 8, 10.)

22

- On January 10, 2021, Discover denied Johns's application for a credit card. (ECF No. 131-20 at 2.) The letter goes on to say that Discover's decision "was based in whole or in part on information obtained in a report from the consumer reporting agency listed below," where below it lists Experian. (*Id.* at 3.)

- On November 23, 2021, Synchrony Bank denied Johns a TJX Rewards Card "based in part on a credit scoring system that was used to evaluate [her] request." (ECF No. 140-38 at 2.) The denial listed four of the "most significant reason(s)": "Revolving account balances are too high in proportion to credit limits"; "Length of time revolving accounts have been established is too short"; "Not enough total credit line"; "No bankcard accounts reported to credit bureau." (*Id.*) The denial further states that "T.U. CONSUMER RELATIONS" is the consumer reporting agency that provided information used for this decision. (*Id.*) TransUnion does not deny that Synchrony Bank used its consumer report in making this determination. (ECF No. 140-40 at 24.)

- In 2022, Johns was approved for a Discover card. (ECF No. 162-1 ¶ 186.)

### b) *Apartments*

When Johns moved into an apartment on Hamilton Drive, sometime after June 2022, the landlord asked her to explain the First Premier tradeline on her credit file. (ECF No. 160-1 ¶ 109; ECF No. 143-1 at 22.) Johns provided an explanation and got the apartment. (ECF No. 160-1 ¶ 109; ECF No. 143-1 at 22.)[17] She testified more generally that she had trouble finding apartments. (ECF No. 196-9 at 9.) Johns testified that she did not have an issue getting the apartment she was living in at the time of her June 2024 deposition. (*Id.* at 10.)

---

[17] Johns's letter of explanation also addressed property destruction in a prior apartment caused by her son's father. (ECF No. 143-1 at 22.)

### c)       *Jobs*

Johns testified that in 2018 and 2019, she refrained from applying for certain jobs where she believed the company would look into her credit in order to avoid embarrassment. (ECF No. 196-9 at 10.)

### d)       *Emotional Distress*

Johns alleges that she suffered emotional harm as a result of Defendants' credit reporting. (ECF No. 77 ¶ 25.) Specifically, Johns asserts that she has "suffered difficulty sleeping, and emotional distress." (ECF No. 162-1 ¶ 191.)

Around July 2023, Johns began therapy at P&G Clinical Services due to anxiety and a depressive mood following a breakup with a boyfriend, her son's father, who had assaulted and threatened her. (ECF No. 161-1 ¶¶ 85–86.) A Comprehensive Clinical Assessment from P&G Clinical Services describes the physical, psychological, and sexual abuse Johns experienced in foster care, from her adoptive parents, and from her ex-boyfriend. Johns reported the following stressors in her life: "Talking to people who want to know about my breakup. My ex and talking to him. Reminders of my relationship are stressful because they remind me of the life we built. My son. Other people telling me I shouldn't be doing things but I feel different so it's stressful. People don't treat me well, but I feel guilty saying that." (ECF No. 121-35 at 2.)

### B.       Procedural History

Johns filed her Complaint in the Court of Common Pleas of Bucks County, Pennsylvania, on November 21, 2022. (ECF No. 1 at 5.) On December 2, 2022, Nelnet removed the action to this Court based on federal question jurisdiction. (*Id.*) An amended complaint was filed on May 3, 2024. (ECF No. 77.) Defendants Santander Consumer USA ("Santander") and Innovis Data Solutions, Inc. ("Innovis") were each dismissed by Johns. (ECF Nos. 38, 112.) This Court granted

Defendant Experian Information Solutions, Inc.'s ("Experian") motion to compel arbitration and stayed the case as to Experian pending the outcome of arbitration. (ECF No. 109.)

On June 9, 2025, Nelnet, Equifax, LVNV, Resurgent, First Premier, and TransUnion moved for summary judgment. Johns moved for partial summary judgment as to Equifax, Trans Union, and Nelnet. Additionally, all Summary Judgment Defendants moved to limit or exclude testimony from Douglas Hollon. Following an extended briefing schedule, inclusive of supplemental briefing at the request of the Court, these motions are now ripe.

## II.    MOTIONS TO EXCLUDE DOUGLAS HOLLON

Johns relies on her expert, Douglas Hollon, throughout the summary judgment briefing to assert that the Summary Judgment Defendants' investigations were unreasonable. The Court therefore addresses the motions to exclude Hollon before addressing the summary judgment motions.

In his expert report, Hollon opines that each Defendant failed to (1) conduct adequate investigations into Johns's notices of dispute, (2) delete or correct inaccurate information, (3) have adequate policies and procedures in place concerning the accuracy and integrity of furnished information, and that each Defendant's failure to process Johns's disputes resulted in inaccurate, damaging information being reported about her. Additionally, Hollon opines generally on the consumer reporting industry, including his opinions on the e-OSCAR and ACDV process.

### A.    Legal Standard

Under Federal Rule of Evidence 702, a proponent of expert witness testimony must demonstrate to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 tasks the Court with a "rigorous gatekeeping function." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)). The December 1, 2023 amendment to Rule 702 served to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee Notes, 2023 Amendments. The Advisory Committee Notes further state that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," which is an "incorrect application" of the Rule. *Id.*

The Third Circuit has said that Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock*, 233 F.3d at 741. To be qualified under Rule 702, the proffered witness must have specialized knowledge, which "can be practical experience as well as academic training and credentials," and "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id.* (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).

An expert is reliable when their opinions "reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)); *see also Hoefling v. U.S. Smokeless Tobacco Co.*, 576 F. Supp. 3d 262, 271 (E.D. Pa. 2021) (reliability analyzes "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion.") (internal quotations omitted). The focus of reliability is "on principles and methodology, not on

26

the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). "[T]he expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). In evaluating reliability, the Court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (quoting *Elcock*, 233 F.3d at 745–46)). Where the expert employs "a non-scientific method," the Court should consider these factors "where they are reasonable measures of the reliability of expert testimony." *Elcock*, 233 F.3d at 746 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Lastly, an expert is fit when their testimony assists the trier of fact. *Paoli R.R.*, 35 F.3d at 742–43. Fit requires a connection between the methodology and the factual issues in the case. *Id.* "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case.*" *Id.* at 743 (emphasis in original). Fit primarily goes to relevance. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017).

### B.    Qualification

The Summary Judgment Defendants assert that Hollon is not qualified to opine on their investigations, or their policies or procedures. They argue his opinions are based on the dictionary definition of "investigation" and his personal experience as an investigator with the U.S. Army Criminal Investigation Division ("CID"). First Premier further argues that Hollon is specifically not qualified to testify as to a furnisher's investigations or its policies and procedures. Additionally, the Summary Judgment Defendants argue that Hollon is not qualified to opine on Johns's damages.

27

They argue he has no experience, education, training, or other specialized knowledge that qualifies him to render opinions on credit scoring, or the extent and causation of Johns's alleged damages because he has never worked for a lender or business that assessed consumers' creditworthiness, nor is he a psychologist or financial advisor. Moreover, they argue that he did not review Johns's deposition testimony before preparing his report or attending the first day of his deposition, and instead relied solely on credit denial letters. They assert that Hollon did not calculate the impact of the disputed information on Johns's creditworthiness or score, and has no basis to opine about how a particular creditor would view or interpret consumer reports.

Hollon is the owner of Credit Experts of North Texas, LLC. (ECF No. 130-2 at 7.) He worked at Experian from 2005 until 2019, where he began in a position assisting consumers with their disputes, and then handled escalated credit report disputes for his remaining years with Experian. (ECF No. 130-3 at 3; 170.) While at Experian, he received specialized training involving fraud and "mixed file" disputes. (*Id.* at 3.) Prior to his time at Experian, he was an investigator with the U.S. Army CID, where he conducted investigations for sixteen years. (*Id.* at 170.) He has received FCRA certifications from the Consumer Data Industry Association, has a Credit Analysis Certification from the New York Institute of Finance, has certifications in Credit Risk Modeling and Credit Scorecard Development from SAS Institute, Inc., and has completed the American Bankers Association Certification in Lending Compliance for Compliance Professionals. (*Id.* at 4.)

Hollon's expertise is based primarily on his experience. "If a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendment. In

his report, Hollon explains that his experience at Experian involved handling disputes, assisting tens of thousands of customers, explaining credit score factors, and understanding information received from Public Record Vendors. (ECF No. 130-3 at 3–4.) He also provides that due to his "experience with Experian, through the study of regulatory agency publications, case law, deposition transcripts, company manuals or publications, and other related documents," he possesses extensive knowledge of other CRA and furnisher credit dispute operations, including the policies and procedures of Experian, Equifax, TransUnion, Innovis, other CRAs, and furnishers. (*Id.* at 4.)

While Hollon's explanation of how his experience leads to the conclusions reached in this respect is minimal, the Court finds that Hollon is sufficiently qualified to testify as an expert regarding investigations and reinvestigations of credit disputes by CRAs and furnishers. *See also Panchenko v. Comenity Cap. Bank*, No. 23-CV-04965, 2025 WL 2372597, at *3 (N.D. Cal. Aug. 13, 2025); *Wright v. HireRight LLC*, No. CV-23-00493, 2025 WL 928852, at *4 (D. Ariz. Mar. 27, 2025). While he does not have direct experience working for a creditor or lender, nor has he performed any investigations from the perspective of a furnisher, the experience and knowledge that he has in credit reporting agency spaces is greater than that of the average layman. The Court also finds that Hollon is qualified to speak, "in general terms and as found relevant at trial, about the sort of damages that are typically caused on consumer reports." *Oatway v. Experian Info. Sols., Inc.*, No. 2:24-CV-00523, 2025 WL 2689029, at *11 (W.D. Wash. Sept. 19, 2025); *Nelson v. Experian Info. Sols., Inc.*, No. CV 2:23-1634, 2024 WL 3219180, at *3 (D.S.C. June 27, 2024). Hollon addresses this specifically in the section titled "Impact of Inaccuracies on Credit Report." (ECF No. 130-3 at 164–65.)

### C.      Reliability

The Summary Judgment Defendants argue that Hollon's opinions on Defendants' investigations, and their policies and procedures, are not reliable. Specifically, they argue that his opinions on policies and procedures are based on prior knowledge of Experian's procedures, regulatory agency publications, case law, deposition transcripts, and "company manuals or publications and other related documents" that he is unable to identify. (ECF No. 133-1 at 5–6.) They further argue that Hollon failed to outline any reliable principles or methods upon which his opinions are based, and instead relies on testimony he has read in previous cases of other CRAs without being able to identify what the specific testimony is.

In response, Johns asserts that there is no standard procedure for a reasonable investigation under the FCRA, and so Hollon's experience "is the closest the jury will get to a standard, industry-wide practice." (ECF No. 169 at 8.) She argues that "Hollon repeatedly ties his opinions to his own experience." (ECF No. 170 at 12.) She also asserts that Defendants have not shown that Hollon's CID experience is *not* relevant to their investigations.

As the Court noted above, an expert's experience with no explanation for how that experience supports their conclusion cannot be a substitute for reliable principles or methods. Hollon repeatedly states that his opinions are based on his "experience, skills, and knowledge," with no explanation for *what* in his experience, skills, or knowledge draws upon in reaching that conclusion. (*See, e.g.*, ECF No. 133-2 at 20, 29, 33, 24; ECF No. 130-4 at 5, 10, 24, 31, 37.) An expert cannot be reliable when relying solely on the ipse dixit of the expert. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

30

Additionally, Hollon relies directly on his investigative experience at CID without any explanation for how this experience supports his conclusions in the consumer reporting industry. Below is an exemplary exchange relying on his CID experience:

> Q: Okay. Do you have any authority or source that First Premier was obligated to contact Ms. Johns in connection with her disputes?
>
> . . .
>
> A: Well, if you're going to get to the truth of a matter, that's part of the steps in an investigation.
>
> Q: Is that based on your experience, or is that some sort of source or authority that you're quoting from?
>
> A: Well, if you – from my training as a CID agent, when you get information, you have to interview people. The – you know, First Premier, you know, could take the opportunity to interview her to find out what happened and get more facts.

(*See, e.g.*, ECF No. 142-5 at 17–18.)

While Johns suggests it is the Defendants' burden to show why Hollon's CID investigative experience is not applicable to the FCRA context, that disregards the burden imposed under Rule 702 on the proponent of the expert testimony. Further, Equifax and TransUnion do specify clear distinctions between the investigations and reinvestigations that CRAs and furnishers undertake when receiving disputes in contrast with CID investigations. When Hollon conducted CID investigations, he had subpoena and search warrant power through the assistance of JAG officers (ECF No. 142-5 at 8), and the ability to place someone under arrest (*id.* at 11). Moreover, he had no time constraint on the investigation, but rather "would exhaust [his] leads" and "go as far as [he] can" (*id.* at 10–11). CRAs and furnishers, however, have limited time periods as defined under the FCRA to investigate a dispute. Moreover, what determines a reasonable investigation for CRAs and furnishers is based in part on the amount of information received in a dispute—a "boil the ocean" mentality of conducting an investigation for as long as it takes, serving subpoenas, and

conducting searches pursuant to warrants, is not only unavailable for CRAs and furnishers, it is clearly beyond what the FCRA contemplated.

Hollon's reliability further falters as he is unable to identify what he relies on. For instance, he references deposition transcripts involving these Defendants in other cases, but cannot identify what cases they came from. (*See, e.g.*, ECF No. 133-2 at 41–44.) Additionally, while Hollon makes numerous references to his reliance on "industry standards," he is unable to articulate what these standards are.

Q: And what standards would you use to evaluate it or determine what to do next?

A: Well, you'd have to look at the industry standards . . .

. . .

Q: . . . [W]hat industry standards apply?

A: Well, it's a case-by-case basis. You have to look at the facts of the case. And then again, you would have to look at what goes on in the industry. And then – cause, you know, the [] big three, Equifax, Experian and TransUnion, you know, those – decisions that are made by those companies are looked at in the industry as standards. So you would have to – but you have to take it by a case-by-case basis and look at the facts of the case and then weigh against those industry standards. . . .

Q: . . . So tell me what industry standards apply to the processing of an identity theft block request.

A: Again, it would take the – a case-by-case basis on what you're provided. First, you have to get the facts of the case. Okay. You have to look at what was – you know, what is the facts of the case, what is the – in the evidence of the case. You have to look at that, so it's a case-by-case basis that you would use to weigh that according to the industry standards.

Q: And what is that industry standard?

A: It depends on the facts of the case. The facts of the case is what determines that. …

(ECF No. 130-4 at 5–8.) The question regarding industry standards would be expected to elicit a response that identifies standards, not an answer that suggests the contrary or some measure of fluidity, which is what "case-by-case basis" suggests.

Hollon's opinions are rendered more unreliable because they do not dependably flow from the facts. He asserts: "I believe that she submitted a police report which is – and she was a victim of identity theft. That is my opinion." (ECF No. 130-4 at 30.) His report opens with, "Plaintiff, Alycia Johns, is a victim of identity theft." (ECF No. 130-3 at 6.) But the alleged identity theft in this case is not so clearly established. Rather, it is only Johns's testimony and the police report—based on her statement, which does not specify which tradelines she asserts are the result of identity theft—which support this conclusion. It is the province of the jury, not an expert, to make credibility determinations. *See Betz v. Temple Health Sys.*, 659 F. App'x 137, 140–41 (3d Cir. 2016). Hollon further opines, with no citation, that First Premier and Nelnet failed to notate with compliance codes that the tradelines had been disputed. (ECF No. 130-3 at 149–50.) However, the evidence reflects that the First Premier tradeline was identified with the "XB" compliance code beginning at least by June 5, 2020. The evidence also reflects that Nelnet updated Johns's account to reflect the "XC" compliance code following the first dispute it received.

As noted above, Hollon is qualified to opine on the types of damages that errors in a consumer report may cause. However, the Court finds that the opinion offered in his report addressing this issue is unhelpful to the jury. The jury will consider documentary evidence and testimony from Johns regarding damages. Generalized statements from Hollon regarding the harm other consumers have faced when their consumer reports contained inaccuracies is not relevant to the present case.

Ultimately, the Court finds that Hollon's opinions are unreliable for the above-mentioned reasons. The opinions he offers lack methodology; cite to no reports, research, or other reliable material; and fail to explain how his experience leads to his conclusions. *See also Nelson*, 2024 WL 3219180, at *2–3; *Oatway*, 2025 WL 2689029, at *9–11. Because Hollon's opinions are unreliable, his opinions are not helpful to the trier of fact, and thus there is no "fit." His testimony is therefore excluded pursuant to Rule 702.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant bears the burden of proof, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its initial burden, the non-movant's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S.

34

at 322. Under Rule 56, the Court must view the evidence presented in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

### B.    Background and Obligations Under the FCRA

Congress enacted the FCRA to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit." 15 U.S.C. § 1681(b). "Congress intended to promote efficiency in the nation's banking system and to protect consumer privacy." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010). The FCRA places certain duties on CRAs and furnishers. Sections 1681n and 1681o provide private rights of action for willful and negligent noncompliance with duties imposed by the FCRA. 15 U.S.C. §§ 1681n, 1681o.

### 1.    CRA Obligations

Johns claims that TransUnion and Equifax violated 15 U.S.C. §§ 1681e(b), 1681i, and 1681c. (ECF No. 77 ¶¶ 38–40, 62–64.)

Section 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." A plaintiff must establish four elements for noncompliance of § 1681e(b): "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry." *Bibbs v. Trans Union LLC*, 43 F.4th 331, 342 (3d Cir. 2022) (quoting *Cortez*, 617 F.3d at 708).

Section 1681i provides, with certain exceptions:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and

the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer . . . .

15 U.S.C. § 1681(a). This Section also requires the CRA to provide notice of the dispute to the furnisher who provided any disputed information. *Id.* § 1681i(a)(2). Thus, § 1861i(a) governs a CRA's behavior when reinvestigating upon notice of dispute, while § 1681e(b) governs a CRA's behavior when preparing credit reports generally. *See Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714, 720 (E.D. Pa. 2011). Establishing liability under § 1681i requires proof of the following: (1) the plaintiff's credit file contains inaccurate information; (2) the plaintiff notified the credit reporting agency directly of the inaccurate information; (3) the plaintiff's dispute is not frivolous or irrelevant; and (4) the credit reporting agency failed to conduct a reasonable reinvestigation of the disputed items. *See Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 212–13 (E.D. Pa. 2007). For a § 1681o claim, the plaintiff must also establish actual damages caused by a defendant's § 1681i violation.

Section 1681c-2 provides:

Except as otherwise provided in this section, a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such an agency of—(1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a). The statute provides CRAs with specified authority to decline or rescind a block. *Id.* § 1681c-2(c). Liability under § 1681c-2 arises when a consumer meets the relevant criteria and a CRA does not block the information disputed as being the result of identity theft.

36

*Lavender v. Experian Info. Sols., Inc.*, No. CV 21-4739, 2023 WL 3739041, at *4–5 (E.D. Pa. May 30, 2023). Similarly, for a § 1681o claim, the plaintiff must also establish actual damages caused by a defendant's § 1681c-2 violation.

### 2.    Furnisher Obligations

Johns claims that First Premier, LVNV, Resurgent, and Nelnet violated their FCRA obligations pursuant to 15 U.S.C. § 1681s-2(b). (ECF No. 77 ¶¶ 33, 83, 97, 106.) This provision requires furnishers, after receiving notice of a dispute related to completeness or accuracy of information, to: "(A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the [CRA] . . .; [and] (C) report the results of the investigation to the [CRA]. . . ." If a furnisher's investigation finds the furnished information to be inaccurate, incomplete, or that it cannot be verified, the furnisher shall promptly modify, delete, or permanently block reporting of that item of information. § 1681s-2(b)(1)(E).

"Furnishers of credit information to consumer reporting agencies cannot be sued by a consumer for reporting inaccurate information. They can only be sued for failing to conduct a reasonable investigation of a dispute regarding the accuracy of information furnished to and reported by a consumer reporting agency." *Scarbo v. Wisdom Fin.*, No. CV 20-5355, 2022 WL 309161, at *5 (E.D. Pa. Feb. 2, 2022), *aff'd*, No. 22-1398, 2022 WL 16829371 (3d Cir. Nov. 9, 2022). To establish a claim under § 1681s-2, a plaintiff must show (1) they notified a CRA of the dispute under § 1681i; (2) the CRA notified the furnisher defendant; and (3) the furnisher failed to reasonably investigate the disputed charge. *Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 302 (E.D. Pa. 2021) (quoting *Hoffmann v. Wells Fargo Bank, N.A.*, 242 F. Supp. 3d 372, 391 (E.D. Pa. 2017)). For a § 1681o claim, a plaintiff must also establish actual damages caused by a defendant's § 1681s-2 violation.

## C.    Background and Obligations Under the FDCPA

The FDCPA was established "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

Johns asserts that LVNV and Resurgent violated 15 U.S.C. §§ 1692e, e(2), e(8), e(10), and f(1). (ECF No. 77 ¶¶ 89, 112.) Section 1692e prohibits "false, deceptive, or misleading representations or means" to collect a debt. Specifically, § 1692e(2) prohibits false representation of a debt's character, amount, or legal status. Section 1692e(8) prohibits debt collectors from "communicating or threatening to communicate to any person credit information which is known or should be known to be false." Section 1692e(10) prohibits the use of false representations or deceptive means to collect a debt. Lastly, Section 1692f(1) prohibits "unfair" and "unconscionable" debt collection efforts.

## D.    Statute of Limitations

TransUnion, Equifax, and First Premier argue that the claims brought against them are time barred. The FCRA provides a statute of limitations that is the earlier of "2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or [] 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. Here, there is no dispute that Johns discovered the alleged identity theft in 2018. Equifax and First Premier received their first disputes from Johns in 2018. TransUnion received its first dispute from Johns in May 2020. Johns filed several additional disputes with these Defendants, with the final disputes received in 2022. All disputes aside from the final dispute received contained nearly

38

identical information and attachments. The final dispute received by these Defendants also included the 2018 Incident Report. Johns filed this lawsuit on November 21, 2022.

Federal courts are divided regarding whether a consumer's filing of subsequent credit disputes restarts the statute of limitations. Courts allowing new disputes to restart the statute of limitations draw reference to the remedial goals of the FCRA and the plain meaning of the text. *See, e.g.*, *Wylie v. First Nat'l Bank Corp.*, No. 3:18-cv-239, 2019 WL 3006631, at *3 (W.D. Pa. July 9, 2019); *Escobar v. Pa. Higher Educ. Assistance Agency Servs. LLC*, No. CV 17-4212, 2018 WL 1740364, at *5 (E.D. Pa. Apr. 10, 2018); *Gandert v. Embry-Riddle Aeronautical Univ.. Inc.*, No. SACV2001320, 2020 WL 12575072, at *2 (C.D. Cal. Sept. 28, 2020); *Marcinski v. RBS Citizens Bank, N.A.*, 36 F. Supp. 3d 286, 290 (S.D.N.Y. 2014). Cases applying this reasoning have applied it principally to extend § 1681s-2(b). At least one case has extended this reasoning to CRA liability under § 1681e(b) and 1681i. *Owens v. Trans Union, LLC*, No. 4:20-CV-665, 2021 WL 5086370, at *7–9 (E.D. Tex. Aug. 30, 2021), *R&R adopted as modified*, 4:20-cv-665, 2021 WL 4451890 (E.D. Tex. Sept. 29, 2021). The Eleventh Circuit employed this line of reasoning to restart the statute of limitations for claims against furnishers. *See Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1219–20 (11th Cir. 2023).

On the other hand, courts finding that the statute of limitations does not reset with subsequent disputes note that it renders the FCRA's statute of limitations period meaningless. *See, e.g.*, *Lavender v. Experian Info. Sols., Inc.*, No. CV 21-4739, 2023 WL 3739041, at *7 (E.D. Pa. May 30, 2023); *Bittick v. Experian Info. Sols., Inc.*, 419 F. Supp. 2d 917, 919 (N.D. Tex. 2006); *Hancock v. Charter One Mortg.*, No. 07-15118, 2008 WL 2246042, at *2 (E.D. Mich. May 30, 2008). This line of reasoning has been applied to §§ 1681e(b), 1681i, and 1681s-2(b).

This Court agrees that there is no basis in the statutory text to find that only the first dispute triggers the statute of limitations. Each dispute submitted by a consumer, and each consumer report issued, raises obligations under the FCRA. *See Milgram*, 72 F.4th at 1219 ("Because it is the unreasonable investigation that triggers liability, whether the dispute involves new information is irrelevant to the statute-of-limitations question.") However, a defendant's liability is limited to FCRA violations within the statute of limitations—here, for instance, even though Johns's disputes date back to 2018, and those disputes are often nearly identical to disputes in 2021, the statute of limitations bars liability for the 2018 disputes. Finding that subsequent nearly identical disputes are not time barred does not render the statute of limitations period meaningless because Defendants cannot be liable for disputes and damages that predate the statute of limitations. Further, because liability turns on the reasonableness of investigations, or the reasonableness of procedures, if a consumer continually resubmits identical disputes with no new information, a defendant could establish that a minimal investigation was reasonable under the circumstances. *See Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014).

Because the lawsuit was filed on November 21, 2022, the statute of limitations bars liability for any claims under the FCRA prior to November 21, 2020.

### E.    Whether § 1681s-2 Obligations Were Triggered

LVNV and Resurgent argue that (1) LVNV cannot be liable under the FCRA because it does not furnish information; and (2) there is no liability because Johns failed to raise a bona fide dispute sufficient to trigger obligations under § 1681s-2(b).

LVNV asserts that it cannot be subject to liability under § 1681s-2 because that provision applies to entities "which transmit[] information concerning a particular debt owed by a consumer to a consumer reporting agency." *Johnson v. Experian Info. Sols. Inc.*, No. 23-CV-2759, 2023 WL

40

5246293, at *3 (E.D. Pa. Aug. 14, 2023) (quoting *Donohue v. C. Blosenski Disposal Co.*, No. 05-5356, 2006 WL 3423888, at *1 (E.D. Pa. Nov. 28, 2006)). In response, Johns asserts that her credit report lists LVNV as the furnisher of information for the Credit One tradeline. (ECF No. 163 at 6–7.) Johns further asserts that LVNV is vicariously liable for Resurgent's actions based on an agency relationship.

It is undisputed that Resurgent manages LVNV's accounts, and all actions taken with respect to LVNV's accounts, including credit reporting, are performed by Resurgent. (ECF No. 163-1 ¶ 7.) This is sufficient to establish an agency relationship. *See Sam Mannino Enters., Inc. v. Anadarko Petroleum Corp.*, 266 A.3d 662 (Pa. Super. Ct. 2021). Courts have found vicarious liability under the FCRA based on an agency relationship. *See, e.g.*, *Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 966 (6th Cir. 1998); *Yohay v. City of Alexandria Emps. Credit Union, Inc.*, 827 F.2d 967, 972–73 (4th Cir. 1987); *Lukens v. Dunphy Nissan, Inc.*, No. CIV.A. 03-767, 2004 WL 1661220, at *4 (E.D. Pa. July 26, 2004); *Xu v. Better Mortg. Corp.*, No. 5:23-cv-05510, 2025 WL 28556, at *3–4 (N.D. Cal. Jan. 3, 2025). The Court finds that LVNV can be found vicariously liable under the FCRA for actions taken by Resurgent acting as its agent.

LVNV and Resurgent argue that the plain language of the FCRA makes clear that consumers have the initial obligation to provide supporting documentation reasonably required to substantiate the basis of the dispute, without which there is no obligation to investigate. Johns asserts that this position is contrary to the Third Circuit's holding in *Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 240–41 (3d Cir. 2023) that furnisher cannot unilaterally decide a dispute is frivolous and decline to investigate on that basis. However, Resurgent did investigate each dispute, and so it does not raise this argument in contravention of *Ingram*. Instead, LVNV and Resurgent argue that the requirements for a "dispute" under § 1681s-2(a) apply to § 1681s-2(b) under the

41

presumption of consistent usage. In § 1681s-2(a), a dispute "(i) identifies the specific information that is being disputed; (ii) explains the basis for the dispute; and (iii) includes all supporting documentation required by the furnisher to substantiate the basis of the dispute."

However, given the distinction between §§ 1681s-2(a) and 1681s-2(b)—the former being direct disputes, and the latter indirect disputes—it is clear that this definition cannot apply equally to s-2(b). A furnisher receiving an indirect dispute still has an obligation to investigate even if the dispute does not include "all supporting documentation required by the furnisher." The implication of LVNV and Resurgent's position is precisely what the *Ingram* court overturned in holding that furnishers receiving disputes from CRAs are charged with a duty to investigate, with no authority to decline the investigation because it finds it frivolous.

Ultimately, LVNV and Resurgent's concern instead turns on the reasonableness of the investigation. The *Ingram* holding does not green-light a "prove me wrong" practice whereby liability will be found where a dispute contains minimal information. Rather, when a furnisher receives scant or vague allegations of inaccuracy in an indirect dispute, "a more limited investigation may be warranted." *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014). Further, to establish liability, a plaintiff must still also establish inaccuracy. Thus, there are sufficient safeguards on liability where minimal information is provided in a dispute without the bona fide dispute requirement of § 1681s-2(a) applying to § 1681s-2(b).

### F.    Inaccuracy

It is a threshold requirement for liability under §§ 1681e(b), 1681i, and 1681s-2 that the disputed information was in fact inaccurate. *Bibbs v. Trans Union LLC*, 43 F.4th 331, 344 (3d Cir. 2022); *Ritz v. Equifax Info. Servs., LLC*, No. 23-2181, 2025 WL 1303945, at *2 (3d Cir. May 6, 2025). Information that is technically accurate but materially misleading is sufficient to meet this

threshold. *Bibbs*, 43 F.4th at 345. TransUnion, Equifax, LVNV, Resurgent, and Nelnet assert that Johns cannot meet this threshold requirement. The CRAs, LVNV, and Resurgent also argue that disputes regarding identity theft present legal rather than factual questions—whether Johns is *legally* responsible for the debt—which CRAs are not required to determine. The CRAs specifically point to the Santander loan, which discovery revealed Johns did sign, and the Nelnet loans which Nelnet argues were ratified.

In opposition, Johns asserts that "liability will lie <u>even without an inaccuracy</u>" where a CRA fails to conduct a reinvestigation, relying on *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98 (E.D. Pa. 2020) ("*Norman I*"). (ECF No. 160 at 7.) Johns further argues that CRAs and furnishers are obligated to investigate and reinvestigate identity theft disputes because other Third Circuit FCRA cases—*Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997) and *Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231 (3d Cir. 2023)—involved claims of identity theft. Additionally, she asserts that her testimony supports that she did not open the tradelines herself, and no Defendant has put forward any evidence to suggest otherwise. (ECF No. 160 at 8.)

*Norman I* relates to a CRA's duties under the FCRA and not liability under the FCRA. The *Norman I* court held that the duty to conduct a reinvestigation under § 1681i is triggered by the notice of dispute of inaccuracy. 479 F. Supp. 3d at 118. In that case, a consumer disputed a credit inquiry in his report. *Id.* at 109–10. Because the defendant contended that the inquiry was "accurate," it argued that its duty to reinvestigate was not triggered. *Id.* at 116–17. At the summary judgment stage, *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351 (E.D. Pa. 2023) ("*Norman II*") clarified how the FCRA violation in that case differed from *Bibbs*. Specifically, in the *Norman* cases, the defendant conceded that no reinvestigation occurred. *Norman II*, 669 F. Supp. 3d at 376. But here, the Summary Judgment Defendants do not contend they had no obligation to

reinvestigate because of the absence of inaccuracy. Instead, Defendants argue that Johns cannot establish the required elements of her claim for liability without inaccuracy. *Bibbs* is thus the proper application of FCRA liability in this case, and in order to establish liability, Johns must establish inaccuracy.

The Third Circuit's decisions in *Cushman* and *Ingram* similarly do not support Johns's position even though the underlying facts of those cases involved alleged identity theft. . In *Cushman*, the court addressed a CRA's reinvestigation obligations under § 1681i(a). The issue before the *Ingram* court was whether a furnisher in receipt of an indirect dispute can make a threshold determination of frivolousness before conducting an investigation under § 1681s-2. 83 F.4th at 240–41. While the underlying facts of both *Cushman* and *Ingram* involved alleged identity theft, whether the disputed information was in fact inaccurate was not before the court in either case.

The primary evidence supporting inaccuracy is Johns's own testimony, or other materials stemming solely from her statements.[18] Additionally, she asserts that email addresses and phone numbers used to open several tradelines belonged to her parents. While these facts are also only supported by her own testimony, a factfinder could credit that an email address of "srjohns29" or "srjohnss30" is more likely to belong to someone named Sharlise Johns rather than Alycia Johns. "At summary judgment, the ultimate question is whether self-serving testimony, 'when considered in conjunction with other evidence, is sufficient for a rational factfinder to credit [the declarant's]

---

[18] The 2018 Incident Report, for instance, stems exclusively from Johns's report to the police. Additionally, Johns's oppositions to multiple Defendants' summary judgment motions includes a Declaration of Joseph Triplicata. In these declarations, Triplicata declares that he has known Johns since March 2018, is familiar with her "having gone through identity theft," and that he is "aware of each of the circumstances behind the illegitimate loans from First Premier, Santander, Nelnet, and Credit One." (*E.g.*, ECF No. 160-4 at ¶¶ 2–4.) There is no assertion that Triplicata has any of this knowledge from sources other than Johns herself.

testimony, in spite of the testimony's self-serving nature.'" *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 530 (W.D. Pa. 2021) (quoting *Hanna v. Giant Eagle Inc.*, No. CV 15-1009, 2017 WL 1194676, at *12 (W.D. Pa. Mar. 9, 2017), *R&R adopted*, No. 2:15CV1009, 2017 WL 1194713 (W.D. Pa. Mar. 30, 2017)); *see also Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012). The Court finds that the email addresses used for certain accounts could be used in conjunction with Johns's self-serving testimony to credit her assertion of identity theft.

Ultimately, there remain disputes of fact whether Johns can establish that the First Premier tradeline, Credit One tradeline, and SJU Loans were the result of identity theft. Because there is no dispute that Johns signed the Santander loan, there is no factual inaccuracy and thus there cannot be liability. Similarly, any dispute challenging UMA or DeVry Loans cannot result in liability because Johns concedes she took out these loans.

The CRAs, LVNV, and Resurgent further argue that an alleged inaccuracy under §§ 1681e(b), 1681i, and 1681s-2 must be objectively and readily verifiable. (ECF No. 140-40 at 13 (citing *Holden v. Holiday Inn Club Vacations, Inc.*, 98 F.4th 1359, 1368 (11th Cir. 2024); *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 271 (2d Cir. 2023); *Sessa v. Trans Union, LLC*, 74 F.4th 38, 40 (2d Cir. 2023)); ECF No. 131-1 at 20 n.4 (also citing *Roberts v. Carter-Young, Inc.*, 131 F.4th 241 (4th Cir. 2025).) Equifax also argues that where a dispute centers on the legal validity of the underlying debt, rather than factual inaccuracy, a CRA is not required to reinvestigate or resolve that dispute. (ECF No. 131-1 at 20 (citing *Denan v. Trans Union LLC*, 959 F.3d 290 (7th Cir. 2020); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010); *DeAndrade v.*

*TransUnion LLC*, 523 F.3d 61, 69 (1st Cir. 2008).) The Third Circuit has not addressed either of these theories. *See Ritz*, 2025 WL 1303945, at *3.

While there may be some cases in which a consumer's dispute can readily aid in identification of identity theft, the Federal Trade Commission noted that § 1681i investigations are not specifically tailored for identity theft victims and are often not well suited for such a claim because identity theft victims have no records showing they did not open an account. *See* Related Identity Theft Definitions, Duration of Active Duty Alerts, and Appropriate Proof of Identity Under the Fair Credit Reporting Act, 69 Fed. Reg. 63922, 63923 (Nov. 3, 2004).[19]

However, the Court need not determine whether any identity theft claim must be objectively and readily verifiable or if it centers on legal validity over factual validity. The present case is not a typical case of identity theft. And contrary to Johns's repeated assertions, it is highly disputed that all tradelines at issue are the result of identity theft. Johns disputed various tradelines as "Not his/hers," or "Claims true identity fraud, account fraudulently opened," and sometimes by adding "I've been the victim of identity theft. These accounts were not opened by me, and should be removed from my credit profile." It remains unclear the extent to which the accounts are "true identity fraud." For instance, Johns testified that she signed the Santander loan. While she testified that she signed under duress, signing a loan is not true identity fraud. The Nelnet loans create more confusion where she acknowledges taking out the UMA and DeVry loans, took these out under

---

[19] Johns cites to the Consumer Financial Protection Bureau's "Supervisory Highlights: consumer reporting companies and furnishers," (April 2024) for the proposition that furnishers have an obligation to delete identity theft information unless confirmed by the consumer as accurate. (ECF No. 162 at 16.) However, the document notes deficiencies in furnishers' compliance with the FCRA where they continue reporting fraudulent accounts "for several years after determining the accounts were fraudulent," or continue reporting accounts that are identified in an identity theft report. No Summary Judgment Defendant has determined the tradelines at issue to be fraudulent, nor does the 2018 Incident Report identify specific tradelines as the result of identity theft.

the same MPN she claims she did not sign, was repeatedly informed that the MPN governed the terms of the UMA and DeVry loans, and did not initially dispute the SJU loans. Rather, the question of Defendants' obligation to uncover this specific alleged identity theft can more readily be addressed under the reasonableness of the investigation.

### G.        Reasonableness of the Investigations

The FCRA is not a strict liability statute. Under § 1681i for CRAs and § 1681s-2(b) for furnishers, both have a duty to conduct a "reasonable" investigation or reinvestigation. In determining the reasonableness of an investigation, a plaintiff must establish that a defendant would have discovered the inaccuracy in the credit report if it had reasonably investigated the matter. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997). Assessing reasonableness requires balancing "the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014) (quoting *Cortez*, 617 F.3d at 709). This balancing "is a fact-intensive question that requires 'weighing the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information.'" *Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 244 (3d Cir. 2023) (quoting *Seamans*, 744 F.3d at 865).

The Summary Judgment Defendants argue that they are entitled to summary judgment because their investigations or reinvestigations were reasonable. Johns argues that she is entitled to partial summary judgment on the grounds that TransUnion's and Equifax's reinvestigations were unreasonable, and that Nelnet failed to investigate the majority of her disputes.

Johns seeks to argue that even if a consumer solely asserts that an account does not belong to them with no further information, it is a furnisher's duty to then prove that the account is not fraudulent. (ECF No. 163 at 21; ECF No. 165 at 16.) But this is not the duty imposed by the FCRA.

47

While Johns points to *Ingram*, the *Ingram* court found that an assertion from a consumer that "THIS IS NOT MY ACCOUNT. PLEASE REMOVE FROM MY CREDIT" triggered a duty to investigate, not that it triggered a duty to prove this scant information false. 83 F.4th at 241–42. Johns also cites to *Simonson v. IQ Data Int'l, Inc.*, 698 F. Supp. 3d 1055 (W.D. Wis. 2023) for the proposition that "the FCRA's duty to investigate is on the furnisher, not the consumer." No Defendant asserts otherwise. Rather, the reasonableness of the investigation depends on the information provided, and while a consumer's failure to respond to a furnisher's request for information is not dispositive of reasonableness, it is relevant. *Id.* at 1066. Further, § 1681s-2(b) is clear that "if the investigation finds that an item of information disputed by the consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," the furnisher must modify, suppress, or delete that item of information. Thus, the statute directs furnishers to verify the accuracy or completeness of the furnished information, not to prove that a consumer's assertion in a dispute is inaccurate or else delete the tradeline.

While Johns asserts that the Summary Judgment Defendants are attempting to blame the victim and demand more from her to prove their claims, there is no dispute that Johns provided minimal information in her disputes even though she had more information she could have provided. It is further undisputed that counsel assisted her with those disputes where she could have provided more information.[20] The evidence reflects that most Defendants were unaware until

---

[20] As noted by TransUnion (ECF No. 140-40 at 11 n.4), Johns's counsel asserts on their website: "Our Attorneys can assist victims in filing the necessary reports with law enforcement agencies, such as local police reports, and the Federal Trade Commission (FTC). We can also help victims complete Identity Theft Affidavits, *which are essential documents in the resolution process*." https://zemellawllc.com/practice-areas/identity-theft-lawyers/ (last visited March 24, 2026) (emphasis added). The website similarly notes, "We are knowledgeable on how to communicate effectively with credit reporting agencies to have fraudulent accounts removed or corrected." *Id.* The Court notes counsel's expertise to clarify that while some consumers may provide sparse

48

this litigation that the alleged fraud was perpetrated by Johns's parents.[21] When Johns included attachments with her disputes, they were almost always a copy of her identification and social security cards. Eventually, she included the 2018 Incident Report in her final disputes, which, as discussed further below, did not specify which tradelines she asserts were the result of identity theft.

The reasonableness of Defendants' investigations and reinvestigations must be grounded in the information they received. As Johns herself notes, "[r]easonable investigations are based on the information the CRA and furnisher *receive* only, not what it could have received. (ECF No. 171 at 15 (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009).) "[W]here a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted." *Seamans*, 744 F.3d at 865. *See also Ingram*, 83 F.4th at 243 ("[C]ourts regularly take into consideration if a furnisher received minimal information regarding the indirect dispute in determining the reasonableness of its investigation."); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 947 (11th Cir. 2021) ("Even when a consumer has informed the agency about inaccurate information, there may be circumstances—say, when the consumer supplies insufficient detail—in which there is no jury question about the reasonableness of the agency's investigation or reinvestigation."); *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 605 (E.D. Pa. 2012) (noting that an investigation may be reasonable even if it did not uncover inaccurate information, "especially if the notice provided scant information."); *Coulter v. Chase Bank USA, N.A.*, No. CV 18-1538, 2020 WL 5820700, at *5 (E.D. Pa. Sept. 30, 2020) (same).

---

information in a dispute due to lack of knowledge of the process, Johns continued to withhold critical information even with the assistance of knowledgeable counsel.

[21] First Premier received one notice of dispute stating: "THE ACCOUNT WAS OPENED FRAUDULENTLY BY MY PARENTS WITHOUT MY KNOWLEDGE." (ECF No. 136-7 at 2.) The dispute did not include the names of Johns's parents or any other information.

49

Johns points to various specific actions Defendants could have taken in their investigations which, had they done so, would have revealed the fraud. These bare assertions lack evidentiary support. For instance, Johns argues that Nelnet could have contacted SJU and they would have informed it of the fraud. But there is no evidence in the record that SJU had any knowledge of the alleged fraud, putting aside whether SJU would have been permitted to share such information with Nelnet. Johns brazenly asserts without any evidentiary support that she called Nelnet and told them that this was familial fraud. Johns argues that charges to the First Premier credit card would support that it was the result of identity theft, but there is no evidence in the record supporting these specific charges, and even if First Premier's reading of the exhibit was correct, a $494.86 charge at a Buick does not clearly support identity theft. Additionally, Johns argues that LVNV and Resurgent would have discovered the fraud had they contacted Credit One because Credit One deleted the tradeline—but there remains a dispute of fact as to why Credit One deleted the account.[22]

Reasonableness is ordinarily a question for the jury. Courts may decide reasonableness as a matter of law only when "the reasonableness or unreasonableness of the procedures is beyond question." *Seamans*, 744 F.3d at 864–65. It is beyond question that only scant and misleading information was provided in her disputes, and even after the close of discovery, the only evidence supporting identity theft originates from Johns's own testimony. The Court finds that based on this, it cannot be said that any Defendant's investigation was unreasonable as a matter of law.[23]

---

[22] Specifically, the ACDV response that Johns points to in asserting that "Credit One acknowledged the accounts were opened by fraud" (ECF No. 163 at 3) does not contain the word "fraud." Moreover, the document constitutes inadmissible hearsay that cannot be considered at summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

[23] Johns also asserts that Equifax violated § 1681i when it failed to forward the final dispute it received to furnishers. However, § 1681i permits CRAs to terminate a dispute if it reasonably determines the dispute is "frivolous or irrelevant." 15 U.S.C. § 1681i(a)(3). Equifax informed

50

All Defendants assert that their investigations were reasonable as a matter of law. However, First Premier was informed that Johns asserted the tradeline was opened by her parents, and could then see the email address and authorized user associated with the account. A reasonable juror could conclude that something more was required for the investigation to be reasonable.

LVNV and Resurgent were not informed of the familial nature of the alleged identity theft, nor is there evidence that either received the 2018 Incident Report. Resurgent attempted to obtain more information from Johns and received no response to its letters. But it remains to be determined whether Resurgent possessed and reviewed all of the account opening documents from Credit One and if it had those documents, or if it had contacted Credit One, the investigation result would have been different.

TransUnion and Equifax similarly were not informed of the familial nature of the alleged identity theft. They instead received numerous nearly identical disputes with scant information. Both, however, received the 2018 Incident Report, determined it to be illegible, and took no further steps. A reasonable juror could conclude that receipt of the Report should have prompted further inquiry.

As for Nelnet, however, Johns cannot meet her burden to establish that it would have discovered a discrepancy had they undertaken a reasonable investigation. While Johns asserts that Nelnet deemed subsequent disputes "frivolous" and did not investigate, the evidentiary record supports that it conducted investigations for each dispute and relied on prior investigations when no new information was received. While Nelnet internally used the term "frivolous," using that

---

Johns that it was currently processing her previously submitted dispute for these accounts and would not be conducting further investigation at that time, pursuant to its obligations for making this determination. *Id.* § 1681i(a)(3)(B); (ECF No. 161-4). Such a determination is not unreasonable as a matter of law.

term does not mean it chose not to investigate the dispute. Johns similarly asserts that the change of contact information Nelnet received from the Government was indicative of fraud—but it is common for borrowers to move or change an email address or phone number particularly when they are college students who move away from home. The undisputed facts show that Johns continued obtaining loans under the MPN even after filing this lawsuit. Johns has pointed to no evidence that Nelnet would have discovered the inaccuracy had it reasonably investigated the matter. While Nelnet also received the 2018 Incident Report, that Report did not specify it related to student loans, and given the other information Nelnet had, its investigation of the dispute containing the Report was not unreasonable. It is therefore evident to this Court that the investigation conducted by Nelnet into the disputes it received was reasonable.[24]

## H.    § 1681e(b)

Equifax moves for summary judgment on the § 1681e(b) claim on the grounds that Johns cannot establish it failed to follow reasonable procedures to assure maximum possible accuracy. Specifically, Equifax argues that Nelnet, Santander, First Premier, and LVNV are reliable data furnishers who have gone through its thorough vetting and certification process. (ECF No. 131-1 at 22.) In response, Johns asserts that notices of dispute provide notice that furnishers are not

---

[24] Johns asserts a separate failure by Nelnet based on an alleged inability to delete an account unless told to do so by the Department of Education. But Nelnet's representative testified that its "obligation is to report with the information that we have and do so accurately." (ECF No. 196-4 at 28.) Federal law provides that the Department of Education makes the ultimate determination of whether obligations under an MPN can be discharged due to identity theft. 34 C.F.R. § 685.215(c)(5)–(6), (d). Because Nelnet never determined that any of Johns's student loans were the result of identity theft, Johns cannot point to any evidence supporting that Nelnet would be unable to comply with its obligations under the FCRA to modify or delete the tradelines.

Because Johns cannot establish that Nelnet's investigation was unreasonable, the Court need not consider whether Johns ratified the MPN with subsequent loans.

reliable, and that Equifax's blanket policy to not investigate disputes after a second dispute on the same account fails to ensure maximum possible accuracy.

Johns has offered no evidence that Nelnet, Santander, First Premier, and LVNV/Resurgent are unreliable furnishers. Instead, she asserts that these furnishers continued to report inaccurate information. (ECF No. 161-1 ¶ 5.) But it remains to be determined by a jury if there is inaccurate information reported by First Premier, LVNV/Resurgent, or Nelnet. Moreover, Johns takes a vast leap in asserting that a consumer's dispute of an alleged inaccuracy constitutes notice that a furnisher is unreliable. If that were the case, why would the FCRA impose obligations on those furnishers to investigate? Instead, notice of dispute informs the CRA to reinvestigate, which includes contacting the furnishers and receiving their response to the dispute.

Second, no evidence supports that Equifax maintains a blanket policy not to investigate a third dispute on the same account. Rather, the undisputed evidence shows Equifax testified that its policy is that after an account has already been disputed twice, it will not take any action on a third dispute without additional relevant information being provided. (ECF No. 164-1 ¶ 18.) Section 1681i(a)(3) permits a CRA to terminate a reinvestigation that it reasonably determines is frivolous or irrelevant. Equifax's policy reasonably assures that a subsequent dispute on the same tradeline will be considered if there is additional relevant information provided. Whether Equifax should have considered the 2018 Incident Report to be additional relevant information is a question of application of the policy, not the reasonableness of the policy itself.

The Court finds that Johns cannot establish that Equifax failed to follow reasonable procedures to assure maximum possible accuracy, and grants summary judgment in favor of Equifax on the § 1681e(b) claim.

**I.      § 1681c-2**

In August 2022, Johns submitted disputes to TransUnion and Equifax attaching the 2018 Incident Report. While many Defendants assert that the 2018 Incident Report is illegible, the Court finds at least for purposes of analyzing the §1681c-2 claim, it is able to discern the description of the incident from the document.[25] The 2018 Incident Report does not identify which tradelines Johns asserts were created in her name, nor does it identify that her parents were the alleged perpetrators.

Receipt by a CRA of an identity theft report, along with other requirements such as proof of identity, may trigger FCRA obligations under § 1681c-2. Equifax and TransUnion assert that summary judgment should be granted in their favor on Johns's § 1681c-2 claim because the 2018 Incident Report was insufficient to trigger the FCRA's fraud blocking requirements and that exceptions to blocking the tradeline under § 1681c-2(c) applied.[26]

The FCRA defines "identity theft report" to have the meaning given to that term by the rules of the Consumer Financial Protection Bureau ("CFPB"), and "at a minimum, a report— (A) that alleges an identity theft; (B) that is a copy of an official, valid report filed by a consumer with an appropriate Federal, State, or local law enforcement agency, including the United States Postal Inspection Service, or such other government agency deemed appropriate by the Bureau; and (C)

---

[25] The Court relies on the version of the 2018 Incident Report at ECF No. 132-20. Other versions of the report (*e.g.*, ECF No. 140-20 at 3) are significantly more difficult to read, and the Court does not determine whether any Defendant should have determined the entirety of the Report legible. The Court further notes that other portions of the document, including the name of the individual who prepared the Report, are difficult to discern.

[26] While Johns asserts that TransUnion conceded that the 2018 Incident Report triggered its obligations because it informed Johns that it declined to block the tradelines under Section 605B of the FCRA, that letter did not concede that the 2018 Incident Report qualifies as an "identity theft report" under the FCRA. (ECF No. 140-23.) Johns has cited no authority to prevent TransUnion from maintaining this position in later litigation while sending a § 1681c-2(c)(2) communication out of an abundance of caution.

the filing of which subjects the person filing the report to criminal penalties relating to the filing of false information if, in fact, the information in the report is false." 15 U.S.C. § 1681a(q)(4); *see id.* § 1681a(w).

The applicable CFPB rules state that an identity theft report is defined as a report that "alleges identity theft with as much specificity as the consumer can provide." 12 C.F.R. § 1022.3(i)(1)(i). The rules provide illustrative examples of specificity, such as "[s]pecific dates relating to the identity theft such as when the loss or theft of personal information occurred or when the fraud(s) using the personal information occurred, and how the consumer discovered or otherwise learned of the theft"; "[i]dentification information or any information about the perpetrator, if known"; "[n]ame(s) of the information furnisher(s), account numbers, or other relevant account information related to the identity theft"; "[a]ny other information known to the consumer about the identity theft." *Id.* § 1022.3(i)(2).

Johns asserts that the CFPB rules "lend[] automatic legitimacy to *any* police report." (ECF No. 161 at 25.) In support of this, she quotes the following: "A law enforcement report containing detailed information about the identity theft and the signature, badge number or other identification information of the individual law enforcement official taking the report should be sufficient on its face to support a victim's request." 12 C.F.R. § 1022.3(i)(3)(i). However, this example, "provided for illustrative purposes only," goes on to say: "In this case, without an identifiable concern, such as an indication that the report was fraudulent, it would not be reasonable for an information furnisher or consumer reporting agency to request additional information or documentation." *Id.* Nothing in this quotation suggests *automatic legitimacy* of Johns's identity theft claim. Rather, this illustrative example provides an instance where it may not be reasonable for a CRA or

55

furnisher who does not have an identifiable concern to request additional information from the consumer under § 1022.3(i)(1)(iii).

Additionally, Johns cites to *Paulino v. Western Funding II Inc.*, 737 F. Supp. 3d 1338 (S.D. Fla. 2024) in support of her position that a police report need not contain all of the examples identified in 12 C.F.R. § 1022.3(i)(2). In that case, at the Rule 12(c) stage, the plaintiff sent the CRA an FTC Affidavit and a police report stating: "the victim states that on the 8th of November of 2022 a Western Funding Inc. account was opened underneath his name for $16,970." 737 F. Supp. 3d at 1349. Thus, the police report in *Paulino* was already more detailed than that in this case because the specific tradeline at issue was identified.

In support of Defendants' position that the 2018 Incident Report is not an "identity theft report" as a matter of law, TransUnion cites to *Huffman v. Experian Info. Sols., Inc.*, No. 19-cv-07408, 2021 WL 1561304 (N.D. Cal. Apr. 14, 2021). That case involved a credit card that the plaintiff opened but subsequently incurred fraudulent charges. The plaintiff submitted to Experian an incident report with the heading, "Pleasant Hill Police Department Summary Incident Report." *Id.* at *2. The plaintiff generated the report through an online portal, and it was not signed nor did it bear any official stamp. *Id.* The report included a narrative summary of his dispute with the furnisher, but did not include his birth date, driver's license number, social security number, phone number, or address. *Id.* The court found it reasonable for Experian to seek additional information before blocking the report of the furnisher account because (1) the report was generated by an automated system; (2) it lacked several pieces of the plaintiff's identifying information, and (3) the narrative section contained a brief allegation of identity theft without detail. *Id.* at *6.

While the 2018 Incident Report in this case lacked several key pieces of information, most notably the specific accounts Johns asserts were fraudulently opened and the alleged

56

perpetrators—both of which were within her knowledge at the time—the Report contains more than that which was presented in *Huffman*. But more critically, the lacking report in *Huffman* did not clearly absolve the defendant from its § 1681c-2 obligations. Rather, the court found it reasonable for the defendant to seek additional information before blocking the tradeline, as contemplated in 12 C.F.R. § 1022.3(i)(1)(iii). Thus, the Court is not inclined to determine that the 2018 Incident Report, while lacking key information that Johns had at the time, failed to trigger any obligations under § 1681c-2 as a matter of law.

Section 1681c-2(c) provides CRAs with the authority to decline to implement a block requested by a consumer on the basis of material misrepresentation of fact by the consumer relevant to the request to block. Notably here, Johns's block request included the Santander tradeline. This litigation has revealed that the Santander loan was not fraudulently opened in her name, but rather was signed by Johns at the direction of her parents. Even if the CRAs had placed a block, they would have the right to rescind the block based on learning this information. Because Johns's dispute contained a material misrepresentation relevant to her request, the CRAs were not required to block the tradelines.[27] *See Darden v. Experian Info. Sols., Inc.*, No. 1:22-cv-0986, 2024 WL 489442, at *21 (N.D. Ga. Jan. 24, 2024). Summary judgment on the § 1681c-2 claims is granted in favor of TransUnion and Equifax.

---

[27] While Johns argues that Equifax cannot invoke the authority to decline a block because it did not notify Johns of that determination, the Court notes that Equifax sent Johns a letter within four business days stating that it has received the dispute and will not be conducting further investigation at this time. (ECF No. 161-4.) The timing of this correspondence suggests that it is a communication pursuant to § 1681c-2(c). Johns has cited no authority that a § 1681c-2(c) communication is mandated to include certain terms.

### J.    Willfulness

Johns brings her claims against all Summary Judgment Defendants as willful and negligent violations of the FCRA. If she establishes willfulness, she is not required to establish actual damages and causation. *See McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 432 (E.D. Pa. 2020). A plaintiff must demonstrate that a defendant knowingly or recklessly disregarded its statutory duties under the FCRA in order to establish a willful violation. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Recklessness requires conduct that creates an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68. A defendant's conduct is a willful violation of the FCRA when it arises from an "objectively unreasonable" reading of the controlling law. *Norman II*, 669 F. Supp. 3d 351, 386 (E.D. Pa. 2023); *Safeco*, 551 U.S. at 70. Further, a defendant's "objectively unreasonable actions with respect to a particular consumer's account can support a jury finding of willfulness." *Seamans v. Temple Univ.*, 744 F.3d 853, 858 (3d Cir. 2014).

Because the Court finds that Nelnet's investigation was reasonable, it need not address Nelnet's argument in opposition to Johns's willfulness claim.

#### 1.    Equifax and TransUnion

Equifax and TransUnion assert that the undisputed facts show that they reviewed all of the minimal information provided by Johns in her disputes and contacted the data furnishers about the disputed accounts. In opposition, Johns asserts that having a specific policy of parroting information provided by furnishers without conducting an independent investigation into disputes constitutes a willful FCRA violation. (*See* ECF No. 161 at 28 (citing *Cushman v. Trans Union Corp.*, 114 F.3d 220, 225 (3d Cir. 1997)).) Further, Johns argues that TransUnion has already been found willful for the same violations in *Dixon-Rollins v. Experian Info. Sols., Inc.*, 753 F. Supp. 2d 452 (E.D. Pa. 2010) and *Norman II*. Moreover, Johns argues that TransUnion did not forward

all dispute information to furnishers, and it had no policy to ensure that its statutory duties were followed. (ECF No. 160 at 32.)

*Cushman*, in agreeing with the Seventh Circuit, held that "a credit reporting agency may be required, *in certain circumstances*, to verify the accuracy of its initial source of information." 115 F.3d at 225 (quoting *Henson v. CSC Credit Services*, 29 F.3d 280, 287 (7th Cir. 1994)) (emphasis added). Such considerations include whether the CRA knows or should know that the furnisher is unreliable, and the cost of verifying the accuracy of the source compared to the possible harm inaccurately reported information may cause the consumer. *Id.*; *see also Dixon-Rollins v. Experian Info. Sols., Inc.*, 753 F. Supp. 2d 452, 458 (E.D. Pa. 2010) ("A credit reporting agency's reinvestigation obligation is to verify the accuracy of its original source of information. This duty *may* include going beyond the original source.") (emphasis added).

Under the specific facts in this case, it was not objectively unreasonable for Equifax and TransUnion to not go beyond the original source of information. When presented with such sparse and repetitive disputes from Johns, it was not objectively unreasonable for the CRAs to rely on the responses received from furnishers. Such reliance is not merely "parroting," but rather, this particular circumstance did not dictate a need to go beyond the original source. Moreover, there is no evidence of any specific policy whereby these CRAs would never go beyond the original source of information.[28]

Both *Norman II* and *Dixon-Rollins* presented either different policies or different circumstances than the present case. In *Norman II*, as discussed above, TransUnion argued it had no obligation to conduct a reinvestigation where there was no inaccuracy. In *Dixon-Rollins*,

---

[28] Rather, the evidence shows that Equifax did not simply parrot the response it received from a tradeline not at issue in this case who had verified Johns's account.

TransUnion sought judgment of acquittal or a new trial following a jury verdict finding it negligently and willfully violated the FCRA. 753 F. Supp. 2d at 456. There, TransUnion argued that the FCRA does not require it to do more than verify a debt with the original source because the FCRA imposes a higher duty to investigate on the original source. *Id.* at 458–59. The court disagreed and upheld the jury verdict finding that TransUnion had an obligation to look beyond the furnisher's verifications. *Id.* at 459. But in that case, the plaintiff provided TransUnion with a letter from her attorney verifying that the underlying debt had been settled, a receipt of the money order used to settle the debt, and contact information for three individuals familiar with the settlement, and TransUnion did not forward this information to the furnisher. *Id.* The court found that it was not unreasonable for the jury to conclude that TransUnion would have discovered the accounting error had it contacted the individuals listed in the plaintiff's dispute as having knowledge. *Id.* at 460.

Here, TransUnion does not argue that it had no obligation to reinvestigate, nor that the furnishers have a greater obligation to investigate thus easing their investigation burden. Instead, TransUnion argues that based on the scant information contained in the disputes, the investigations conducted were reasonable. Further, TransUnion asserts that it was a mistake, not a policy, resulting in the failure to forward the final dispute to Santander and Nelnet. Given that TransUnion forwarded the dispute to Comenity Bank, not a furnisher at issue in this case, and the lack of a policy identified that would result in TransUnion forwarding a dispute to an incorrect furnisher, there is no evidence to support that such a failure was a knowing or reckless disregard of statutory duties. Johns therefore cannot establish a willful violation of the FCRA by TransUnion and Equifax, and summary judgment on that issue is granted.

### 2. First Premier

First Premier argues that the undisputed facts show it received sparse disputes that lacked specific, actionable information about the fraud, but that First Premier still conducted robust, multi-layered investigations into each dispute. (ECF No. 136-4 at 20–21.) Johns responds that (1) although First Premier "was expressly notified that this was a case of familial fraud," its investigation was limited to confirming the account was opened with the "correct" identifying information, which would not detect familial fraud; (2) First Premier disregarded the 2018 Incident Report; (3) First Premier never contacted Johns for additional information; (4) First Premier ignored obvious red flags in its records, including Johns's mother listed as an authorized user on the account, and the email and phone number not belonging to Johns; (5) First Premier "maintained a policy of offloading its statutory duty to investigate onto the consumer"; and (6) First Premier never reviewed underlying charges or account activity which would have confirmed the fraud.[29] (ECF No. 165 at 21–22.)

Because First Premier was informed of the familial nature of the alleged fraud, reasonableness of its investigation cannot be decided at summary judgment. But none of these asserted failures in First Premier's investigations rise to the level of objectively unreasonable readings of the FCRA that create an unjustifiably high risk of harm. Many of these turn on the reasonableness of the investigation: the extent First Premier considered the 2018 Incident Report, which it deemed illegible; whether it should have contacted Johns for more information; and whether seeing Sharlise Johns as an authorized user should have been a red flag. Johns cites no statutory or case law support that any of these considerations are required under the FCRA. Only

---

[29] There is no evidence contained in this record to support that First Premier did not review the underlying charges.

one of the sixteen disputes suggested that the account was opened by her parents, and that dispute is not within the statute of limitations. The extent to which First Premier should have considered Johns's notice of alleged familial fraud that in subsequent disputes may be a question of reasonableness, but there is no clear statutory or case law authority suggesting that specific steps are required for an investigation of familial fraud. Lastly, Johns has presented no evidence to suggest that First Premier has a policy of "offloading its statutory duty to investigate onto the consumer." Johns therefore cannot establish a willful violation of § 1681s-2 by First Premier.

### 3. LVNV and Resurgent

LVNV and Resurgent argue that Johns has no evidence that they knew or acted with reckless disregard for whether Resurgent's investigation was reasonable. In opposition, Johns asserts that Resurgent's investigations were not thorough, and specifically, that it never sought out the account opening documents or contacted the original creditor. *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016).

LVNV and Resurgent did not address the willfulness argument in their reply. There remain disputes of material fact and summary judgment is improper on this issue.

### K. Johns's Alleged Damages

All Summary Judgment Defendants assert that Johns cannot establish actual harm caused by them.[30] Actual damages and causation are essential elements of Johns's negligence claim. Because of the statute of limitations, as discussed above, Summary Judgment Defendants could only be liable for damages caused by them that occurred following their FCRA violations after

---

[30] Nelnet frames its damages argument as a question of Article III standing. (ECF No. 129-3 at 28.) However, while Nelnet provides the legal standard for analyzing standing, its actual argument asserts that Johns cannot establish actual damages under the FCRA, not that her asserted lack of actual damages dictates that she cannot satisfy Article III standing.

November 2020, assuming Johns establishes their FCRA violations.[31] This limitation notably reduces Johns's damages. Of the five credit card denials, only the Synchrony card denial occurred after the CRAs and furnishers reinvestigated disputes received after November 2020. One of the car financing loan rejections also predates this. Johns's asserted challenges with her job search similarly predate this. Thus, what remains is one credit card denial, four letters denying car loans, claimed challenges applying for apartments, and emotional distress.

An FCRA plaintiff must prove their damages were caused by the defendant's FCRA violations by a preponderance of the evidence. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 966 (3d Cir. 1996). For a § 1681e violation, it is sufficient for a plaintiff to produce evidence from which a reasonable trier of fact can infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit. *Id.* at 968. The plaintiff is not required to prove that inaccurate information was the sole cause of credit denial. *Id.* at 969. In order to claim actual damages, a plaintiff must show they suffered an actual injury and generally cannot rely solely on subjective testimony. *Owoyemi v. Credit Corp. Sols. Inc.*, 677 F. Supp. 3d 285, 301 (S.D.N.Y. 2023). For violations of §§ 1681i and 1681s-2(b), a plaintiff must establish actual damages attributable to the defendant's unreasonable investigation. *Suluki v. Credit One Bank, N.A.*, 666 F. Supp. 3d 403, 413 (S.D.N.Y. 2023), *aff'd*, 138 F.4th 709 (2d Cir. 2025).

### 1.    Credit Denial, Loan Rejections, and Apartment Application

Johns's claimed damages within the statute of limitations, aside from emotional damages, include one credit denial, four car loan rejections, and challenges applying for apartments.

---

[31] While Johns continues to raise damages from before November 2020, she simultaneously acknowledged that courts have addressed concerns regarding restarting the statute of limitations by limiting damages to the limitations period. (*See* ECF No. 160 at 19.)

The 2021 credit denial by Synchrony Bank relied on a TransUnion credit report. Of the four "most significant reason(s)" listed for the denial, three are untethered to any of the tradelines at issue. While TransUnion asserts that the credit denial provides three independent reasons for denial that do not relate to the alleged fraudulent accounts, a reasonable jury may still conclude that the tradelines were a substantial factor in the denial.

Johns cannot show that Equifax was a substantial factor or that their investigations reasonably caused this credit denial. As the credit report came from TransUnion, any damages stemming from this denial cannot be caused by Equifax, the other CRA of the Summary Judgment Defendants. Thus, even if Johns could establish inaccuracy and that Equifax performed unreasonable investigations, no evidence presented on this record supports that it was a cause of a credit denial.

Johns asserts that she experienced difficulty obtaining an apartment. Her only evidence for this assertion is correspondence where she explained the First Premier tradeline on her credit file and then obtained the apartment. While she was able to obtain the apartment after explaining the tradeline, she may still be awarded actual damages based on this. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 720 (3d Cir. 2010). There is no evidence before the Court regarding which credit report the landlord reviewed in finding the First Premier tradeline, and as such, it is not clear if evidence at trial can show whether these damages are attributable to TransUnion or Equifax. However, it is clear that these damages cannot be attributable to LVNV or Resurgent.

As for the Exeter car loan denials, Johns cannot show that any Defendant was a substantial factor in causing actual damages stemming from these denials. It is undisputed that Johns does not have a driver's license. Without a driver's license, Johns would not be able to drive a car even if

she could obtain a loan and purchase one. Such an injury is not genuinely attributable to Defendants.

### 2.      Emotional Distress

An FCRA plaintiff's "actual damages" can include emotional distress. *See Crisafulli v. Ameritas Life Ins. Co.*, No. 13-5937, 2015 WL 1969176, at *4 (D.N.J. Apr. 29, 2015) (collecting cases). However, emotional distress damages must be supported by evidence of "genuine injury" which "may be evidenced by one's conduct and observed by others." *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978). "To recover emotional damages a plaintiff must show 'a reasonable probability rather than a mere possibility that damages due to emotional distress were in fact incurred [as a result of an unlawful act].'" *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002) (quoting *Spence v. Bd. of Ed.*, 806 F.2d 1198, 1201 (3d Cir. 1986)). Mere conclusory statements will not suffice.

While Johns is not required to rule out other possible causes, *see Philbin*, 101 F.3d at 969, establishing her actual damages requires showing that those damages were "a result of the failure" of a defendant to comply with the FCRA. *See* 15 U.S.C. § 1681o. Johns only points to her own testimony that each Defendant was a significant factor in her harms. Such conclusory testimony is insufficient to create an issue of material fact at summary judgment.

### 3.      Costs of Disputing Alleged Inaccuracies

Lastly, Johns asserts that "[a]t the very least," she is entitled to recover for her time and effort in attempting to resolve her credit. She does not quantify the amount of time spent—while she asserts she spent years attempting to correct her credit report, some of that time precedes the applicable statute of limitations. Johns points to two cases where courts considered a plaintiff's time and effort in addressing disputes in assessing actual damages. *See Stevenson v. TRW, Inc.*,

987 F.2d 288, 297 (5th Cir. 1993); *Miller v. Westlake Services LLC*, 637 F. Supp. 3d 836, 854 (C.D. Cal. 2022). Neither of these cases provide that time and effort in resolving disputes, without other damages, can satisfy a plaintiff's obligation to show actual damages for a § 1681o claim.

The Third Circuit has cited approvingly to *Stevenson* that "[t]ime spent trying to resolve problems with the credit reporting agency may also be taken into account." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 720 (3d Cir. 2010). At this stage, the facts remain uncertain regarding whether Johns can show costs relating to each Defendant, particularly as it relates to the furnisher Defendants, and how much time was expended within the applicable statute of limitations as opposed to time prior to that.

### L.    FDCPA

Johns brings claims under the FDCPA against LVNV and Resurgent. To prevail on an FDCPA claim, a plaintiff must demonstrate that "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014). The second and fourth elements are at issue in the present motions.

LVNV argues there is no evidence it is a "debt collector" as defined in the FDCPA, but rather, LVNV is a passive debt buyer who engages in no collection activity itself. Both LVNV and Resurgent argue that Johns lacks evidence that they violated the FDCPA because she cannot prove that they made a false statement about the debt, nor is there any evidence that Resurgent knew or should have known Johns was not responsible for the Credit One debt and tried to collect from her anyway. They also argue that Johns's § 1692f claim fails because it is based on the same conduct as the § 1692e claims, but § 1692f "serves as a catch-all provision that permits courts to sanction

66

conduct the FDCPA fails to otherwise specifically address," *Montgomery v. Midland Credit Mgmt., Inc.*, No. CIV.A 12-1244, 2014 WL 3563198, at *7 (E.D. Pa. June 19, 2014), therefore Johns cannot bring her § 1692f claim based on the same conduct.

In response, Johns argues that LVNV is indisputably a debt collector as defined in the FDCPA, because there is no dispute of fact that LVNV is a "passive debt buyer," and its primary source of income is debt collection. Johns points to other cases finding LVNV to be a debt collector. (ECF No. 163 at 29–30 (citing *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1258 (11th Cir. 2014); *Ramos v. LVNV Funding, LLC*, 379 F. Supp. 3d 437, 440 (E.D. Pa. 2019); *Norman v. Allied Interstate, LLC*, 310 F. Supp. 3d 509, 515 (E.D. Pa. 2018)).) In response to whether Johns can establish a false statement, she reiterates her arguments made for establishing inaccuracy under the FCRA: she asserts there is ample evidence the Credit One account was opened by her parents without her knowledge, and that LVNV and Resurgent have no counterevidence to show that she actually did open the account or were otherwise responsible for the charges incurred. She further asserts that her disputes that the accounts were not hers meant that LVNV and Resurgent should have known that the reporting was false. Lastly, she argues that courts have found that the same § 1692e conduct can also violate § 1692f. (ECF No. 163 at 31 (citing *McMillan v. Collection Pros., Inc.*, 455 F.3d 754, 765 (7th Cir. 2006); *Kaymark v. Bank of Am. N.A.*, 783 F.3d 168, 174–79 (3d Cir. 2015), *abrogated in part by Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019); *Masuda v. Thomas Richards & Co.*, 759 F. Supp. 1456, 1460– 62 (C.D. Cal. 1991)).)

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or

67

due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Debt buyers can qualify as debt collectors under the FDCPA under the "principal purpose" definition when the "business's *raison d'être* is obtaining payment on the debts that it acquires." *Barbato v. Greystone All., Inc.*, 916 F.3d 260, 267 (3d Cir. 2019). "[A] debt buyer qualifies as a debt collector under the FDCPA if the most important goal of its business is the collection of debts, even if it pursues collection through a third party," such as, in this case, Resurgent. *Ramos*, 379 F. Supp. 3d at 441. The court in *Norman v. Allied Interstate, LLC*, 310 F. Supp. 3d 509, 515 (E.D. Pa. 2018) found that LVNV is a debt collector under what *Barbato* would subsequently call the "principal purpose" definition because (1) LVNV admitted it was a debt buyer, and (2) the court took judicial notice of LVNV's website which described the company as a debt buyer with no suggestion it engaged in any other commercial activity.

The same reasoning from *Allied Interstate* remains applicable here. It is undisputed that LVNV is a passive debt buyer, has no employees, and that Resurgent takes all actions with respect to LVNV's accounts. (ECF No. 163-1 ¶¶ 6–7.) The Court takes judicial notice of LVNV's website, which describes LVNV as a debt owner who outsources the management of its accounts to Resurgent. *See* http://lvnvfunding.com (last visited March 24, 2026); *see also* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). The website has no mention of any commercial activity other than owning debt. *Id.* LVNV is therefore a debt collector under the FDCPA.

What constitutes "misleading" under the FDCPA is subject to a similar standard as the FCRA, as "misleading" goes beyond just falsehood. *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 429 (3d Cir. 2018). Here, Johns asserts that the misleading aspect was a falsehood—that her

68

parents opened the Credit One account in her name without her knowledge, and therefore the debt is not attributable to her. Whether a representation is false, deceptive, or misleading is measured "from the perspective of the least sophisticated debtor." *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 454 (3d Cir. 2006). Because a plaintiff must establish that a defendant violated a provision of the FDCPA in attempting to collect on a debt, Johns must establish that LVNV and Resurgent used "false, deceptive, or misleading representations or means" in violation of § 1692e. The Court finds that there remain disputes of fact similar to those addressed in Section III.F regarding inaccuracy.

Section 1692f "allows the court to sanction improper conduct that the FDCPA fails to address specifically." *Dicesari v. Asset Acceptance LLC*, No. 11-CV-6815, 2012 WL 4108944, at *3 (E.D. Pa. Sept. 18, 2022) (quoting *Adams v. Law Offices of Stuckert & Yates*, 926 F. Supp. 521, 528 (E.D. Pa. 1996)). Because Johns's § 1692f claim is based on the same conduct as her § 1692e claim, she cannot maintain her § 1692f claim. *See Garcia v. Portfolio Recovery Assocs., LLC*, No. 115CV3685, 2018 WL 3218665, at *5 (D.N.J. June 29, 2018) ("Although the Third Circuit has not yet explicitly addressed the issue, courts in this circuit have held that conduct that is a violation of another section of the FDCPA cannot be the basis for a separate claim under § 1692f.") (internal quotations omitted).

## IV.    CONCLUSION

For the foregoing reasons, the motions to exclude Douglas Hollon are granted. Summary judgment is granted in favor of Nelnet. Summary judgment is granted on the § 1681c-2 claims in favor of Equifax and TransUnion. Summary judgment is granted on the § 1681e(b) claim in favor of Equifax. Summary judgment is granted on the § 1681n claim in favor of TransUnion, Equifax, and First Premier. Summary judgment is granted on the § 1692f claims in favor of LVNV and Resurgent.

69

Plaintiff's summary judgment motions are denied. Summary judgment is denied on the § 1681o claim as to TransUnion (related to § 1681e(b) and § 1681i), Equifax (related to § 1681i), First Premier, LVNV, and Resurgent. Summary judgment is denied on the § 1681n claim as to LVNV and Resurgent. Summary judgment is denied as to the § 1692e claims.

An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**